## FRENCH RINGO v. THE STATE.

No. 4060. Decided November 18, 1908.

**1.—Murder—Indictment—Constitutional Law—Reasonable Creature in Being.**

Upon trial for murder where the indictment was in the usual form, an objection that it failed to charge that the person alleged to have been

killed was a reasonable creature in being, and was therefore in violation
of section 10 article 1 of the Constitution of Texas, and of section 1 of the
Fourteenth Amendment of the Constitution of the United States was untenable
and there was no error. Following Dwyer v. State, 12 Texas Crim. App.,
535, and other cases.

### 2.—Same—Assignment of Error—Practice on Appeal.

An assignment of error that the court erred in giving to the jury a
voluminous confused charge, etc., which the jury did not understand, etc.,
was too general to demand a review on appeal.

### 3.—Same—Newly Discovered Evidence—Want of Diligence.

Where upon motion for new trial on the ground of newly discovered evidence,
it appeared, from the record in the nature of things, that defendant must
have known of the alleged absent witnesses, or could by the slightest dili-
gence have known of their presence during the homicide, and that reasonable
diligence on his part would have discovered the nature of their testimony
there was no error in overruling the motion.

### 4.—Same—Evidence.

Where upon trial for murder the evidence showed that there had been no
difficulty or ill-will between defendant and deceased before the night of the
homicide and that defendant's possession of a pistol was not in itself an
incriminating fact, testimony that defendant had engendered, some two or
three years before the killing, the ill-will of certain persons, who threatened
to take his life, and that therefore defendant had a pistol on the night of the
killing was properly rejected.

### 5.—Same—Charge of Court—Murder in First Degree.

Where upon trial for murder the defendant was convicted of murder in
the second degree, he could not complain of a charge on the law of murder
in the first degree, although that offense was not probably raised by the
evidence; but the evidence showing that the killing was unlawful and was
not committed under such circumstances as to exclude the issue of murder
in the second degree, there was no error in the court's charge submitting the
law of murder in the second degree.

### 6.—Same—Charge of Court—Self-Defense—Apparent Danger.

Where upon trial for murder the court's charge on self-defense submitted
not only actual but apparent danger, and sufficiently guarded the rights
of defendant, there was no error in refusing a special instruction on the law
of self-defense as applied to the issue of reasonable expectation of death
or serious bodily injury.

### 7.—Same—Sufficiency of the Evidence.

Where upon trial for murder the defendant was convicted of murder in
the second degree which conviction was sustained by the evidence, the same
will not be reversed because there was some evidence raising the issue of
self-defense and manslaughter, and strong evidence of manslaughter.

Appeal from the District Court of Fayette.     Tried below before
the Hon. L. W. Moore.

Appeal from a conviction of murder in the second degree; penalty,
ten years imprisonment in the penitentiary.

The State's testimony was substantially that defendant and de-
ceased were at a negro dance; the deceased was killed about ten o'clock
in the night; that defendant and deceased were out at the barn gam-
bling at "Monte" in the early part of the night; they had no trouble

or words between them out there; defendant won a quarter from the deceased on the game; deceased said he did not have the money to pay and defendant said he had better pay him; no words were heard between defendant and deceased there; but later on in the night defendant and deceased were scuffling outdoors on the ground at the end of the gallery of the house where the dance was, and it looked like the deceased had the defendant and was holding him and trying to take a stick or something out of his hand; but they both seemed to have hold of whatever it was; that it was found out that it was a pistol in the defendant's hand; that they fell off the gallery together; that after they fell off the gallery onto the ground defendant got up first and before deceased could get up defendant shot him; that the deceased was not seen with any knife, it was not thought he had any; defendant only shot once after he fell off the gallery, a pistol shot was heard in the house before defendant shot outside; after defendant shot deceased, he ran; that deceased was trying to get up and he said, "Boys, I am gone," and then went around the corner of the house and fell and died there; that he said nothing else; that at the time defendant shot deceased they were just as close as they could be not to be on top of one another; the shot set deceased's clothing on fire; that upon examination the deceased's foot and the toe of his shoe were shot; that the floor was examined and the bullet that struck deceased's shoe went through the floor; that just before the scuffling between the defendant and deceased while the parties were within the house, the deceased went around and got in front of defendant and they were saying something, but what they said was not known; that they were not in a good humor at the time; that defendant drew a gun and he was told that would not do, and he came very near shooting the gun off and he was then turned loose; that when he fired the gun off it was pointed towards the deceased; that the shot went into the floor two or three steps from the door; that if deceased had a knife it was not seen; that they ran out on the gallery and they were tussling as they went out and fell to the ground; that defendant appeared to be on his all-fours, and the deceased was on his right hand straightening up after he was shot; that deceased walked fifteen or twenty steps from there and around the corner of the house and there he died; that deceased was shot after he straightened up; that the shot was heard by several witnesses; that a great many people were in the house and made much noise so witnesses could not hear what was said, but it was thought deceased and defendant were quarrelling then; that some one tried to take the pistol from defendant but they did not succeed; that the parties then ran together; it was not known whether deceased ran upon defendant or not, they then went to tussling and went out of the door together, they were going out backwards; that the next shot was fired just as the two parties were getting up; that a shot

gun was heard fired before the shot of the pistol was fired in the house, some time before; that no knife was seen in the hands of the deceased; that some State's witnesses testified that they did not know who fired the fatal shot; that it appeared that three shots were fired, the first was the shotgun in the house, the next from the pistol into the floor, and the last with the pistol that killed the deceased; that the bullet which killed the deceased entered the left side about six inches below the arm pit and came out just above into the rear of the right hip.

The testimony for the defense was substantially as follows: That the deceased, after he left the place where the game had been going on, was seen when he went into the house and got a shotgun on the night of the difficulty; that when he got the gun he aimed to kill defendant; that the gun was taken away from deceased after he shot it off; that the same was fired in an effort to take it away from the deceased; that after that deceased said he would be quiet; that this was twenty-five or thirty minutes before the killing; that the gun belonged on the place; that when the gun went off the defendant was coming onto the gallery; that witnesses could not say that defendant heard the threats of the deceased to kill him; that it seemed that he could have heard; that deceased had a knife in his hand shortly before the homicide, coming out of the kitchen going into the room where the dance was going on; that he said that defendant had mistreated him and he was going to kill him if it was the last thing he ever did; that this was a butcher knife or at least a good-sized knife; that he had it in his right hand, the blade was sticking back up his arm; that he had his hand down his side; that deceased was cursing and said he was going to kill defendant; that this was only a few minutes until the pistol fired and deceased was killed; that the knife was found lying on the ground after the killing right where the deceased was killed; and it looked like a butcher knife; that deceased and defendant were coming out of the house and fell off of the gallery scuffling; that defendant fell off first and deceased on top of him; that they seemed to get up at the same time; that when they arose the shot was fired; that they were close together when defendant shot deceased, he, defendant, was just getting up, that defendant knocked deceased's hand up and then knocked it up again and then he shot him, that they were right close together; that defendant had his left hand up holding the deceased and had his pistol in his right hand and poked it right at him, that deceased had the reputation of being quarrelsome and that defendant's reputation was that of a law-abiding man.

Defendant himself, testified that when he won the money in the game, deceased said he did not have the money to pay, and that he told him not to fool with him; that he never bet his money unless he meant to take the money when he won it; that he told deceased,

"Pay me," and deceased said, "How in the Hell can you win the money out of my pocket and I have not got it here in my hand to pay you?" that defendant told deceased to pull defendant's money off; that deceased did not do it, and that when he said he was not going to pay defendant the money that he had won, he commenced getting up and picked up the cards; that deceased then said, "Let me see you make me pay you;" that he then stepped back and the boys commenced rushing out and defendant said, "I am going to have my money because I won it;" that deceased was caught once and turned loose again; that he went out and before long defendant heard a shot fired up about the house a short time after deceased left; that defendant was about ten steps from the house when he heard the shot; that when he, defendant, got to the house he heard some scuffling and some one said that the negroes were fussing in there and then the gun fired; that then everything quieted down, the defendant walked into the house and when he got in he saw deceased and deceased came up to defendant and said, "You damn son-of-a-bitch, I am going to kill you, if it is the last thing I ever do;" that he was coming towards defendant and looked at him and defendant looked back at him; that both stood there for some time and deceased said to defendant that he would never like defendant after he had had that trouble come up, and defendant said for deceased to go on and he could see defendant to-morrow if he wanted to settle the trouble with him; that deceased just stood there and defendant told him again to go on and not have any trouble, not to start a row where the ladies were, etc., and that the deceased then said, "Damn that, I am going to tell you what I have to tell right now;" and then he caught defendant in the collar and struck at him with a knife; and as defendant had seen the knife before deceased struck, defendant threw his hand up and warded off the blow and caught deceased's arm; then defendant pulled the pistol and when he pulled it, stuck it down by his side and some one came up and was about to take the pistol, and defendant thought that if he shot the pistol the party would turn it loose, and so he fired it; that the deceased pushed defendant out towards the gallery and defendant thought he was going to kill him and he, defendant, hit the ground and thought by falling there, deceased having hold of him would attempt to kill defendant with a knife when he hit the ground, and defendant thought he had better shoot just as soon as he knew deceased was going to do that, and so he shot as quickly as he could; that defendant never had any trouble with the deceased before that night; that they had always been friends up to that time; that defendant never thought that he would ever have to do a thing of that kind.

*Brown & Lane,* for appellant.—On question of insufficiency of indictment, cited cases in opinion; also Huntsman v. State, 12 Texas Crim. App., 619; Hewitt v. State, 25 Texas, 722.

566 %TEXAS CRIMINAL REPORTS. [*Tyler*,

*F. J. McCord,* Assistant Attorney-General, for the State.—On question of indictment, cited authorities in opinion. On question of court's charge: Childs v. State, 35 Texas Crim. Rep., 573.

RAMSEY, JUDGE.—Appellant was indicted in the District Court of Fayette County charged with the murder of one Cabe Griffin. On trial he was convicted of murder in the second degree and his punishment assessed at confinement in the State penitentiary for ten years.

1. The charging part of the indictment is as follows: "That French Ringo in said county and State, on or about the 19th day of October, in the year of our Lord nineteen hundred and seven, did then and there unlawfully, with malice aforethought, kill Cabe Griffin by shooting him with a pistol, against the peace and dignity of the State." Appellant filed a motion to quash this indictment for the reason, as claimed, that the same charged no offense against any of the laws of the State of Texas, and that the indictment was fatally defective in that it did not allege that Cabe Griffin, the creature alleged to have been killed, was a *reasonable creature in being.* The proposition is made by appellant in his attack upon this indictment, as follows: "The constitutional rights to demand the nature and cause of the accusation guarantees to the accused that the indictment or information shall set forth every fact and circumstance necessary to a certain, specific and complete description of the particular offense attributed to him, so as to characterize and make it appear judicially in the indictment; and an indictment which does not set forth and describe the offense sought to be charged with such certainty is not sufficient to hold the defendant to answer for crime, and is in violation of section 10, article 1, of the State Constitution and section 1 of the Fourteenth Amendment to the Federal Constitution and which provides, in substance, as follows: 'No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. Nor shall any State deprive any person of life, liberty or property without due process of law.'" In support of this contention appellant submits the following authorities: Section 1 of the Fourteenth Amendment to the Constitution of the United States; Amendments 5 and 6 to the Constitution of the United States; section 10, article 1 (Bill of Rights), State Constitution; section 28, article 1, State Constitution; section 19, article 1 (Bill of Rights), State Constitution; article 438 Code of Criminal Procedure (Wilson's Crim. Stats., p. 129); article 3 of the Penal Code; article 53 of the Penal Code; article 710 of the Penal Code; article 435 Code Criminal Procedure; article 440 Code of Criminal Procedure; Williams v. State, 12 Crim. App., 619 to 694; Wupperman v. State, 13 Texas, 33; People v. Lee Look, 137 Cal., 590; 70 Pac. Rept., 660; Hewitt v. State, 23 Texas, 722. On this question counsel for appellant

have filed a most interesting and vigorous argument. Whatever might be our opinion, as an original proposition, it is sufficient to say that this very question has many times been before this court and has been frequently and decisively ruled adversely to appellant's contention. The indictment in terms follows the form prescribed by law. White's Code of Criminal Procedure, article 458. See also Dwyer v. State, 12 Texas Crim. App., 535; Green v. State, 27 Texas App., 244; Jackson v. State, 34 Texas Crim. Rep., 38; Drye v. State, 14 Texas Crim. App., 185; Echannon v. State, 14 Texas Crim. App., 271; Walker v. State, 14 Texas Crim. App., 609; Moore v. State, 15 Texas Crim. App., 1; Phelps v. State, 15 Texas Crim. App., 45; Sharpe v. State, 17 Texas Crim. App., 486.

2. The second assignment of error is as follows: "The court erred in giving to the jury a voluminous confused charge, which did confuse the jury and which they did not or could not understand, and therefore instead of being an instruction to them of the law applicable to the case, was but a confused mass of literature which their minds were incapable of unraveling." This assignment is so general as to point out no error and is not such an assignment, as contained either in the motion for a new trial or in the brief, as to demand a review at our hands.

3. Again, it is urged that the court erred in not granting appellant's motion for a new trial because of the newly discovered evidence of Lee Dillard and Charlotte Jackson. It is claimed in the motion that Lee Dillard, who resided in Lavaca County, Texas, if present, would testify that he was present at the time appellant shot deceased and just prior to the shooting he saw deceased come into the house and ask for a gun, and that the women whom he asked refused to tell him where it was, but that another woman near by, told him where the gun was; that he got it and started out of the house; that some one stopped the deceased at the door; that there was a tussle between these men and the gun went off; that a few minutes after the gun went off, deceased came back and started outdoors with a knife in his hand and some one stopped him and as they stopped him they said, "Don't let him out, he has a knife in his hand;" and a little while afterwards the witness heard two shots fired and then heard the deceased was killed. It is also stated in his motion for a new trial that the said Dillard is a stranger to appellant and unknown to him and that he had no knowledge that said witness knew the facts above set forth and could prove them; that this evidence of said witness, Dillard, is very material to the defense of defendant, and that he had used every effort to discover such evidence as might be of avail to him, but was unable to obtain this evidence before the trial of his cause. A new trial was also sought, as stated, on account of the newly discovered testimony of one Charlotte Jackson, who would testify that the first she knew of any difficulty

was when deceased ran into the house where she was seated and asked a woman unknown to her, "Where is the gun?" That this woman refused to tell him where the gun was, whereupon, another young woman told him she would tell him where it was if he would tell her what he wanted with it; he would not tell her, so she told him anyway, after he again asked where it was. After she told him where the gun was he went and got it and started outdoors when another man in the house grabbed him with the gun, and after he got loose from this man, he just leveled the gun at those in the house and told them not to bother him, when another man, called Grady, reached from behind and grabbed him and they both went down and the gun went off. It is alleged in his motion that he was not guilty of any negligence in not obtaining this evidence before the trial of his cause, and that he did not know that these witnesses knew such facts. There is no statement of what particular diligence, if any, he used to discover the presence of these witnesses and what they knew with reference to the details of the difficulty, and we think that in the absence of some showing, that this motion should not have been granted, and this, particularly in view of the fact that substantially the same evidence was adduced from a number of other witnesses. It seems to us, in the nature of things, that appellant must have known of these witnesses, or could by the slightest diligence, have known of their presence, and, knowing this fact, reasonable diligence on his part would have discovered the nature of their testimony. In every case, civil or criminal, parties litigant should be held to a high degree of diligence to prepare their cases for trial and to adduce the testimony on which their case will be heard and determined.

4. Again, it is urged that the court erred in refusing to allow the defendant to introduce the witness Mat Howard and prove by him that some two or three years prior to the killing that the defendant assisted in an arrest on the charge of rape, whereby he had engendered the ill-will of certain persons in the vicinity, who had threatened to take his life and that in consequence thereof, he had warned appellant that his life was in danger if he went out unarmed at night, but had refused to tell him from whom he was in danger for fear it might cause trouble, which said evidence was offered for the purpose of proving why appellant had a pistol on the night of the killing. It will be noted that this conversation occurred some two or three years prior to the homicide. The evidence seems to show, beyond doubt, that there had been no difficulty or ill-will between appellant and deceased before the killing at which the homicide happened, and it does not seem to us to be relevant in so far as it relates to the deceased, to make this proof, and in view of the remoteness of the time, the conviction of murder in the second degree, and no claim, or showing of antecedent acts or preparation, that the possession of the pistol of itself was an incriminative

fact. This evidence seems to us, not to have been admissible and in any event to have had such a remote bearing on the case as not to have been important.

5. Complaint is made of the charge of the court in that same improperly submitted to the jury the issue of murder in both the first and second degree. The contention being that the evidence adduced on trial of the case did not warrant or authorize the court to charge the jury on either degree of murder, and that there was no evidence introduced on the trial of the case which would justify the submission of these issues. We think that there was probably no evidence in the record to justify the submission of the issue of murder in the first degree, but there was an acquittal of this degree of murder and this passes out of the case. We think, however, the evidence does raise the issue of murder in the second degree. The origin of the difficulty seems to be obscure and there is some uncertainty, but the issue was distinctly made that the killing was unlawful; nor, was it unquestionably true that it was under such circumstances as to exclude the issue of murder in the second degree. One of the witnesses, Richard Howard, among other things testified as follows: "When I got there I saw French Ringo and Cabe Griffin. Just as I got there Cabe Griffin went around and got in front of Ringo and they were saying something, but what they said I do not know. I do not think they were in a very good humor at the time; I do not know. I saw French draw a gun and I went up to him and told that that would not do, and French came very near shooting the gun off, and I turned it loose. When he fired the gun off it was pointed toward Cabe. The shot went into the floor two or three steps from the door. If Cabe had a knife or pistol in his hand at that time I did not see it. When this was over I went out of the house and into the back part of the house. They ran out on the gallery. I did not go out until after the last shot. They tussled as they went out and fell to the ground. I did not see French get up until after Cabe was shot. French was 'kinder' on his all-fours. Cabe was on his right hand straightening up after he was shot, but did not die right there. He walked about 15 or 20 steps from there and around the corner of the house and there he died. Cabe was shot after he straightened up. I heard the shot and saw Cabe. I got out of the house before he died. I did not hear him say anything. French went under the wire and went on home. I heard him say nothing." It is, of course, in many cases difficult if not impossible, if the killing be conceded to be unlawful, to determine whether it is murder or manslaughter. We do not think the court in this case, would have been justified in declining to submit the issue of murder in the second degree. It, therefore, follows that he did not err in so doing.

6. Complaint is made again of the failure of the court to give

a special charge requested by counsel for appellant on the law of self-defense as applied to the issue of reasonable expectation of death or serious bodily injury. The court gave a charge on self-defense applying same not only to actual danger, but the following charge in respect to reasonable apprehension of danger: "A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time, and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant. If from the evidence you believe the defendant killed the said Cabe Griffin but further believe that at the time of so doing the deceased had made an attack on him which, from the manner and character of it, caused him to have a reasonable expectation or fear of death or serious bodily injury, and that acting under such reasonable expectation of fear, the defendant killed the deceased, then you should acquit him; and if the deceased was armed at the time he was killed and was making such attack on defendant, and if the weapon used by him and the manner of its use such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or aimed to inflict serious bodily injury upon the defendant." We think that this charge sufficiently guarded the interest of appellant and it was not error to refuse the special instruction requested.

7. Finally it is claimed that the verdict of the jury was contrary to the law, unsupported by the evidence and without evidence to support it. We can not accede to this contention. While there was some evidence raising the issue of self-defense, and while on the whole case, it would seem to us that the killing was not above the grade of manslaughter, we do not believe that we would be justified under well settled rules, in reversing the judgment of conviction of murder in the second degree. It is therefore ordered that the judgment of the court below, be and the same is hereby in all things affirmed.

*Affirmed.*

[Rehearing denied.—Reporter.]