PEDRO ZUNAGO, ALIAS PEDRO SANIGO, ALIAS PEDRO RODRIGUEZ, v. STATE.

No. 443.    Decided May 17, 1911.

Rehearing Denied June 23, 1911.

1.—Murder—Death Penalty—Sufficiency of the Evidence.

Where, upon trial of murder, the evidence sustained the conviction of murder in the first degree assessing the death penalty, there was no error.

### 2.—Same—Evidence—Child Witness—Discretion of Court—Bill of Exceptions.

Where, upon trial of murder, no abuse of discretion was shown in permitting a child witness of the age of nine years to testify for the State, there was no error; besides the bill of exceptions did not show what the testimony of this witness was.

### 3.—Same—English Language—Practice in District Court.

Where, upon trial of murder, defendant's attorney offered a motion to the court, after the State and defendant had rested and before argument began, that the defendant was ignorant and unable to speak or understand the English language; that attorneys could not speak or understand his language, and that many witnesses had testified in the English language against him, and moved the court to strike out all this testimony, but failed to show that the court had been requested to furnish the attorneys an interpreter, and the testimony objected to was not of such a nature as to need translation for the defendant, there was no reversible error.

### 4.—Same—English Language—Interpreter.

While there is no statutory provision requiring that all pleadings and court proceedings shall be in the English language, yet this is necessary as a matter of course, and where a witness does not understand and speak the English language an interpreter must be sworn for him; and where upon trial for murder an interpreter was provided to translate the Spanish into English and vice versa the testimony admitted, there was no error.

### 5.—Same—Constitutional Law—Confronting Witnesses.

Upon trial of murder, where defendant's counsel contended that the defendant could not speak or understand the English language, insisting that certain testimony submitted in the English language was not understood by the defendant, and that therefore he was not confronted by the witnesses against him as provided by the Constitution, the same was untenable and there was no error.

### 6.—Same—Indictment—Reasonable Creature in Being.

Where the indictment, in a prosecution for murder, was in substantial compliance with the requisites of an indictment as prescribed by law the same was sufficient, and it was not necessary to allege that the deceased was a reasonable creature in being.

### 7.—Same—Argument of Counsel.

Where no bill of exceptions was reserved to the argument of State's counsel the same could not be considered on appeal.

### 8.—Same—Charge of Court—Erasures—Self-Defense.

Where, upon trial of murder, the issue of self-defense was not raised by the evidence, and the court gave a full and correct charge on the degrees of murder, manslaughter and reasonable doubt, and ran his pencil through a printed charge on self-defense in submitting his above charge, and also submitted accidental shooting, which was the theory of· the defense, there was no reversible error.

### 9.—Same—Verdict—Misspelling—Polling Jury.

Where, upon trial of murder, the jury wrote the word jury "juor" there was no reversible error; besides the judgment shows that the jury were properly polled before the verdict was received.

### 10.—Same—Practice—Handcuffs.

Where, upon appeal from a conviction of murder, the objection that the sheriff kept the defendant handcuffed. etc., during the progress of the trial, was not reserved by a bill of exceptions, the same could not be considered on appeal; however, such practice is condemned.

Appeal from the District Court of Williamson. Tried below before the Hon. Chas. A. Wilcox.

Appeal from a conviction of murder in the first degree; penalty, death.

The opinion states the case.

*J. F. Taulbee* and *Wilcox & Graves,* for appellant.—On question of admitting testimony of child witness: Holst v. State, 23 Texas Crim. App., 1; Taylor v. State, 22 Texas Crim. App., 529; Freasier v. State, 84 S. W. Rep., 360; Kenney v. State, 79 S. W. Rep., 817; Childress v. State, 103 S. W. Rep., 864; Munger v. State, 57 Texas Crim. Rep., 385, 122 S. W. Rep., 874.

On court's failure to submit self-defense: Scott v. State, 10 Texas Crim. App., 112; Edwards v. State, 5 Texas Crim. App., 593; King v. State, 13 Texas Crim. App., 277; Bell v. State, 17 Texas Crim. App., 539.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, Judge.—The appellant was indicted by the grand jury of Williamson County on June 11, 1909, for the murder of his wife, alleged to have occurred May 31, 1909. The indictment is as follows:

"In the name and by the authority of the State of Texas. The grand jurors of Williamson County, in. said State, duly empaneled, sworn and charged as such at the June Term, A. D. 1909, of the District Court of said county, in and for the Twenty-sixth Judicial District, upon their oaths, in said court, present: That Pedro Zunago, alias Pedro Sanigo, alias Pedro Rodriguez, in said county and State, on or about the 31st day of May in the year of our Lord nineteen hundred and nine, and before the presentment of this indictment, did then and there unlawfully, with malice aforethought, kill Lula Zunago by then and there shooting the said Lula Zunago with a pistol, against the peace and dignity of the State." The indictment is properly signed by the foreman. He was tried in November, 1909, and the death penalty assessed.

There were but three eyewitnesses to the murder, each of whom testified in full. There was a fourth witness who saw and heard a part of what occurred at the time of the killing, who also testified fully. The appellant and these four witnesses were Mexicans. The appellant himself testified. All of these Mexicans testified through an interpreter.

There are certain uncontroverted facts borne out by the whole record and shown by the testimony of the appellant, as well as other witnesses, to this effect: The appellant was married to the deceased about four months prior to the time she was killed. Before they married appellant claimed she had been kept by a white man at Taylor, Williamson County, for some time. Upon their marriage they moved to the country several miles from Taylor, where he worked on a farm

and at various other things for about four months. For some reason, undiscovered, but without any special cause from the appellant, she became dissatisfied, and wanted to return to Taylor, and did so. The appellant went with her to some station near Taylor and put her on the train, and he returned to the country. In a day or two thereafter he also went to Taylor, had an interview with her in the evening when he first reached Taylor, some five or six days before the killing. He also saw her again that night. He did not stay with her while there. He claimed that the man who had kept her before had also seen her while she was there, and he knew this. After they had both been at Taylor for a few days she went from Taylor on the Katy train, Sunday, just after noon, to the little town of Circleville, a railroad station near Taylor—called there to attend one of said State's witnesses who had just been confined. The appellant learned this Monday morning, and just twenty-four hours after she left Taylor for Circleville he went from Taylor on the train to Circleville, the train arriving at Circleville between one and two o'clock Monday, the day of the killing. The appellant owned a pistol which he had had for some time before he went to Taylor, and took it to Taylor with him in his grip. After getting to Taylor on Monday he bought some cartridges for his pistol. Just before he took the train he went into one of the saloons and took a few glasses of beer. While there the saloon-keeper who waited on him saw him take the pistol, and he at that time loaded it, and took it with him to Circleville. The witness for the State above referred to, named Sabino Pachiko, went on the train with him from Taylor to Circleville. This witness, and the appellant also, testified that just before getting to Circleville the appellant asked the witness if the toilet on the railroad coach was open, and when assured that it was he went into it and took his pistol and placed it in his bosom. This witness and appellant both got off of the train when it stopped at Circleville. The said witness was one of the section-hands of the railroad, and he at once went from the train to the closet, and on that account did not see nor hear all that occurred between the appellant and his wife at the time she was killed, but he did see and hear a part of what occurred between them at that time.

A Mexican woman, one of said witnesses who saw and heard all that occurred from the time the appellant reached Circleville until after the appellant killed his wife and fled, testified as follows: "My name is Lorenza Sifuntez. During last May and June I lived there at the depot at Circleville; I lived there only about fifteen days. I know the defendant, Pedro Zunago. The day he came out there was the first time I ever saw him or knew him. He came there on the train, and got there at about one-forty; I don't know exactly at what time the train came in. I knew Lula Zunago; I became acquainted with her on the day she and a woman by the name of Mazina and I got on the train together. As to where Lula is now, that man over there (points to defendant) killed her; he killed her with a pistol.

When the defendant first got there he went right on into the room; he didn't ask to come into the room. He told Lula that he wanted her to leave there, and Lula said it was heap easier for him to kill her than it was for him to take her away from there. I don't know where he wanted to take Lula, but he wanted her to leave from there. She asked him if that was what he came there for, and he told her it was. I told the defendant not to do anything to Lula in that room, because my children were in there. The defendant didn't say anything to that. Pedro was out there jerking Lula around, and he had his gun in his hand, and I went out there and tried to defend Lula. The defendant had his pistol in his hand, and he jerked Lula outside the house and told her that he came to kill her. Lula begged him not to kill her. Lula had no knife or pistol or anything; she had just got up from the bed. I don't know where he shot her, but her mouth was bloody. I did not hear any more than three shots; I was scared, because my whole family was there. I did not hear Lula say anything after she was shot; I didn't hear anything at all I was so scared. I did not see Lula fall. There was another man there besides us; he came there on the train. The defendant asked this other man if he came there to defend this woman, and he told him not to come up there—that if he did he would shoot him. The name of that other man is Sabino Pachiko. He did not live there, but came there to work on that same section. The defendant left there shortly after the killing; he went right off, with a grip or valise in his hand. He was running when he left there. He had the grip in one hand and the gun in the other. By gun I mean a pistol. As to whether he went down the road or through the woods—he went along the railroad. The little boy who was in here awhile ago is my boy. He is nine years old, going into ten. He can speak English a little." Cross-examination: "As to the first thing Pedro did when he came up there, I will say that he went right into the house and called the lady, and he told her he wanted her to leave. I do not know where he wanted her to go; I don't know whether he said he wanted her to go to Taylor. Lula told him then that it was heap easier for him to kill her than it was for him to take her away from there. That occurred in the same room where I was; all three of us women were there in the same room where this occurred. After Lula told him it was easier for him to kill her than take her away, he jerked Lula outdoors. Lula was in the same room I was in when he jerked her outdoors, and I caught hold of her and begged him not to hurt her. He pulled the pistol when he went outdoors. I don't know what Pedro said when I asked him not to hurt Lula. When Pedro started outdoors he grabbed Lula by the head and commenced hitting her, and said that is what he come for—to kill her. When the first shot was fired I was in the door; Pedro and Lula were not very far away from me at that time—about as far as from here to the stove. (Distance from witness to stove about ten or twelve feet.) Lula was down—

sitting down—and he was hitting her with the pistol. She got down when he jerked her out there; she fell down as he jerked her out there. Pedro was the one that had hold of the gun; Lula never had hold of it; she did not have hold of the front end of the gun. I didn't pay any attention to the gun; can't say whether it was a white gun or a black gun, or what color gun it was. As to the number of shots that were fired, I heard three; I stood there all the time—stood still; I didn't pay much attention to the number of shots because I was so scared. I don't know who dressed the woman's body after she was dead; they picked her up and carried her to Taylor. I went out and looked at the woman's body after she was shot, but didn't see where the bullet hit. All I saw was that her mouth was torn up. When the defendant went down the railroad track he went towards Granger. I did not hear him say anything after the shooting. Lula did not say anything to me about Pedro on the day she was killed. Pedro did not say anything to Lula about signing a paper of any kind when he came there; I don't know whether he said anything to her about getting a divorce or not. Lula had been at the house there for about twenty-four hours." Re-direct examination: "I reckon Lula came out there from Taylor. Lula did not say a word after she was shot. Lula did not move after she was shot; she died right away. The American people came there and got Lula's body. I did not see anybody touch her body until the American people came there. As to whether or not I have anything against this defendant, I will say yes; I am mad with him, because it is a wonder he didn't hurt us, me and my children. That is all I am mad at him about." Re-cross-examination: "As to whether I am mad at him, then, or not, I will say that I am."

Another Mexican woman, an eyewitness, by the name of Mazina Leoma, testified in full, and in every way corroborated the testimony of said witness just above given. Another eyewitness, a Mexican boy, the son of Lorenza Sifuntez, who was between nine and ten years of age at that time, also testified in full, corroborating the testimony of the other two witnesses. Neither of these witnesses were shown to be mad at appellant or had any ill-will towards him. The testimony of all three of these witnesses is substantially the same. They vary only just so much as would naturally be anticipated from any three persons who saw and heard the same things at the same time. Said witness Pachiko corroborated these three witnesses in a good deal of what they had testified. He, however, as explained adove, did not see and hear all that occurred. What he did see and hear corroborated the other three witnesses.

The appellant claimed that he thought he might meet the white man who had been keeping his wife when he got to Circleville, and claimed that he went to Circleville not for the purpose of killing his wife, but for the purpose of taking her back to Taylor, so as to be enabled to get a divorce from her, claiming that he had consulted a

lawyer at Taylor while he was there and before his wife went to Circleville. The attorney whom he claims to have consulted about a divorce testified that the appellant had talked to him some about the subject, but that he was not employed by the appellant, and the consultation with him and the advice given by him was meager, and with no definite arrangement about either procuring a divorce or the steps to be taken thereabout.

1. The verdict and judgment assessing the death penalty is attacked, among other grounds, because it is contrary to the law and not supported by the evidence, and the verdict is harsh and excessive and too severe, and not warranted by the facts adduced on the trial of the cause.

We have time and again carefully gone over this testimony and the record, and have reached the conclusion that it is amply sufficient, and is entirely satisfactory to us, the evidence is clear, and that there is no doubt about the guilt of the appellant of murder in the first degree. Of course, the verdict of the jury in assessing the death penalty is a matter that must be left, under the circumstances, entirely to the jury and the lower court, and it not having been disturbed by the lower court, we would not be authorized to set it aside on that ground.

2. Appellant's first bill of exception complains of the action of the court in permitting the Mexican boy, Aurelia Gonzales, to testify, on the grounds that he was not shown to have sufficient discretion to understand the nature and obligation of an oath, and that he had not sufficient discretion to understand the nature and illegality of the act constituting the offense of perjury. This bill gives the examination in full of this witness on his voir dire, which is as follows: "Aurelio Gonzales, a witness for the State, being duly sworn, testified through an interpreter as follows: Direct examination by the district attorney: "Q. Ask him how old he is. A. He said nine years. Mr. Graves: I believe we would like to examine him to see if he is qualified. Judge Hamilton: All right, just a minute. We will be glad to have you examine him. The court: Either one of you can examine him. Judge Hamilton: How old are you? A. He said nine years old, going into ten. Q. Ask him where he lives. A. Taylor. Q. Ask him how long he has lived at Taylor. A. About six months. Q. Ask him if he ever lived at Circleville. A. Yes, sir, Q. Ask him how long he lived in Circleville. A. He said about a month, he reckoned. Q. Ask him if he ever saw that man before. Mr. Wilcox: We shall object to him going into the case. The court: Go ahead and ask the question. Mr. Wilcox: We want to see if he is qualified to testify before he goes into the case. Judge Hamilton: I am asking him anything, until we have an opportunity to test him. The court: All right, go ahead." Cross-examination (by Mr. Graves) on behalf of the defendant: "Q. Ask him if he knows where he is now, and what they are doing with him. A. Yes. Q. Where? A. He says he is

there (witness points to chair on which he is sitting.) Q. Ask him if he knows what it means what you asked just awhile ago when you made him hold up his hands. A. Yes, sir. Q. What does it mean? A. He says, to tell the truth. Q. Ask what they will do with him if he doesn't tell the truth. A. He said he don't know. Mr. Graves: I believe that sufficiently shows that he is not testifying subject to the pains and penalties of perjury. Judge Hamilton: I think you can ask any witness that, and he would make the same answer. I would like for the court to take charge of the witness, if he doubts his knowledge of right and wrong." Examination by the court: "Q. Ask him whether he thinks it is right or wrong to tell a lie. A. He says he don't know. Q. Ask him if there is any kind of punishment for people that tell a lie. A. He says, yes, sir. Q. Ask him if he knows what it is. A. No, sir. Q. Ask him if he ever went to school. A. No, sir. Q. Can he read or write? A. No, sir. The court: Did you want to ask him any further questions? Judge Hamilton: I would like to ask him a question." Re-direct examination (by Judge Hamilton): "Q. Ask him if it is right to tell a story or wrong to tell a story. A. He says to tell the truth. Q. Ask him if it is wrong to tell a story. A. Yes, sir. Q. Ask him what becomes of boys that don't tell the truth. A. He says he don't know. Q. Ask him if he ever was in a courthouse before as a witness. A. No, sir. Q. Ask him if he ever saw that man before. Mr. Wilcox: Wait; we shall object to him testifying anything about the defendant, because we think, under the witness' own statements it is shown conclusively that he does not know what the penalties or punishment for perjury is, and he says that he doesn't know what they will do with him or what will become of him; and under the witness' own statements it appears that he doesn't—isn't qualified as a witness to testify in a criminal charge against the defendant, and we shall object to his testifying anything about the case, under the facts as stated by the witness himself. The court: I will permit the witness to testify. The objection is overruled. Mr. Wilcox: Note our objections.

"Whereupon the court overruled the defendant's objections to the allowing of said child to testify, and said child was allowed to testify before the jury as to all the circumstances surrounding the killing for which this defendant was then and there on trial, to all of said ruling of the court the defendant then and there in open court excepted and here and now tenders this his bill of exceptions No. 1, and asks that the same be approved and ordered filed as a part of the record in this cause. Which is accordingly done. Chas. A. Wilcox, Judge."

It will be noted that this bill does not show what the testimony of this witness was, but simply says: "And said child was allowed to testify before the jury as to all the circumstances surrounding the killing for which this defendant was then and there on trial." It

will, therefore, be seen that this bill, under the uniform holding of this court is insufficient and we might decline to notice it, because it does not show what the testimony of the witness was. It is also the uniform holding of this court that the statement of facts can not be looked to for the purpose of in anyway aiding a bill of exceptions. In this case we do not intend to contravene any of these rules, yet, it being a death penalty, we have carefully gone over the testimony of this witness in the statement of facts.

This court held, in the case of Williams v. State, 12 Texas Crim. App., p. 127, as follows: "The mode of eliciting and determining by examination the fact of competency is left to the sound discretion of the judge; and when the exercise of that discretion has been called in question, it has been more than once declared by this court that 'we believe that the court before whom the examination of a child offered as a witness is made is better able to determine as to its competency to testify than this court can possibly be from the bare transcript, and we would not feel warranted in reversing a conviction had on account of the admission of such testimony unless it was made clearly to appear that the discretion of the court had been abused.' Brown v. State, 2 Texas Ct. App., 115; Ake v. State, 6 Texas Ct. App., 398; Brown v. State, 6 Texas Ct. App., 286." This has been the uniform holding of this court and it is supported by all of the cases and the text books. While this is true, this court has also uniformly held that it will review the discretion exercised by the lower court, and if it is shown in the record that this discretion has been abused by the lower court, it will so hold, and in such event will reverse the judgment of the lower court on that account. The decisions of this court have frequently held that the lower court did not err where it permitted witnesses of the age of seven years to testify and who showed, upon their examination upon voir dire, and the testimony given in the case itself, that they had no more intelligence or comprehension of the nature and obligation of an oath and of the offense of perjury, than was shown by this witness in this case. We deem it unnecessary to cite the cases. See article 768, subdivision 2, Code Crim. Proc., and the cases thereunder cited in White's Code, pp. 605-606; Munger v. State, 57 Texas Crim. Rep., 385, 122 S. W. Rep., 874. We hold, in view of this bill of exceptions, the statute and decisions thereunder and the testimony of this witness shown by the statement of facts, that the lower court did not commit a reversible error in permitting this witness to testify.

3. The other bill of exceptions by the appellant shows that after the State and the defendant had rested and before argument had begun to the jury, the defendant prepared and offered a motion to the court which was to the effect that "the appellant was ignorant, unlettered and unable to either speak or understand the English language; that certain attorneys had been appointed by the court to represent him and did represent him and conduct his defense; that

he was informed and believes that his attorneys are unable to speak or understand the Mexican language, and that they have been unable to hold any conversations by means of and through an interpreter; that some of the witnesses who testified have testified in the Mexican language and he understood what the import of that testimony was, but that the witnesses Sid Quinn, J. S. Scarborough, Wayne Magill, J. F. Black, Harvey Denson, Sampson Connell and Dr. F. C. Fleckinger testified in the English language, which is not understood by him, and that he did not know what their testimony was, nor has their testimony been interpreted to him, nor could he aid and assist his attorney in examining said witnesses and he has been unable to offer any aid or suggestion to his attorneys in their cross-examination; that these witnesses were for the State, and placed on the stand by the State. He, therefore, moved the court to strike out and exclude from the jury all the testimony of said witnesses and that the jury be directed not to consider the same for any purpose whatsoever." This motion was signed by Wilcox & Graves, who evidently were the attorneys who represented him. It was not sworn to by anyone. The court overruled this motion and the defendant excepted.

The substance of the testimony of each of these witnesses showed that neither of them testified to anything in connection with the killing and did not purport to know anything about it, except what they saw a few hours after the deceased was killed when they were called thereto after she was killed.

The testimony of Black was that he was justice of the peace at Taylor, in Williamson County; that he knew the appellant and the deceased only slightly and had seen them only occasionally before the death of the deceased; that he was called to the body of the deceased at Circleville after she was killed, and he went there to hold an inquest and did so. He then testified that a few hours after the killing when he examined her she was on the ground at the depot at Circleville, where she evidently fell when she was shot; that he found that she was shot in the mouth and in the back just below the shoulder-blade, like. Her teeth were knocked out and her tongue was torn; he thinks there were no powder burns; he does not know whether the bullets came out through the body or not, as he could find no place where they came out. Considerable blood had run out of her mouth; her clothes on her back were soaked with blood; she was a fleshy Mexican woman, weighed about 160 pounds; she looked to have been a healthy woman; he saw no other marks of violence upon her, except the two places where she was shot; he helped to remove the body from the ground into the depot building; he thinks her neck was possibly broken. He could have placed his little finger in the wound in the back, but did not try to do so.

The substance of the testimony of Quinn was that he was a saloon keeper at Taylor; he knows the appellant, who was in his saloon a few

minutes just before the train going north to Circleville arrived, and he drank two or three glasses of beer; he took the train just afterwards; he saw him when he got on the train; with reference to his being drunk or sober he was not very drunk; he did not have over two or three glasses of beer; he knew the deceased, but did not know that she was appellant's wife until after she was killed; he did not know her general reputation for chastity and virtue.

The witness Denson swore in substance that he was deputy sheriff at Granger the day the deceased was killed and went to Circleville on the same day, some hours after, she was killed, called there by the killing; that he went on horseback; he found the body of the deceased there at the depot; he saw blood running out of her mouth, but made no critical examination of her wounds; he made a search for the appellant and looked for him until sundown and all that night, and afterwards kept a watchout for him, but was unable to find him and never found him in that county.

Said witness Magill, in substance, testified that he was a deputy sheriff of Williamson County, and on the day the deceased was killed he was called to Circleville because thereof; he did not examine the wounds of the deceased, but saw where her mouth had been shot; he noticed blood on the clothing and her clothing were bloody; some of her teeth were knocked out and her tongue split, but he did not remember whether her lips were torn; he noticed another wound in the back between the shoulder, like; they were gunshot wounds; the size of the wound in the back was something like that of the little finger; never paid much attention to it; had seen the woman off and on for seven or eight months before she was killed; he did not know whether she was married to the appellant or not.

Connell testified in substance that he was sheriff of Williamson County and knew the deceased and investigated the killing; he did not go to Circleville, but two or three of his deputies did; he made a search of his county, Williamson, for defendant, and kept looking for him until he got him over in Lee County; did not find him in his county, but he was caught in Lee County and he got him from Scarborough, sheriff of Lee County.

Said Scarborough testified in substance that he lived at Giddings, in Lee County, and was the sheriff of Lee County at the time of this killing; he knew the appellant and first met him at the Sap depot, in Giddings; he had a picture of him at the time; the condition of his clothing at that time was that his shoes were wet and his pants up to the knees, as though he had traveled through the dew; after having some talk with him he arrested him, searched him and found a pistol on him. He identified the pistol, which was then introduced in evidence. It was a double-action, self-cocking pistol.

Dr. Floeckinger testified in effect: That he was a surgeon and physician in Taylor, having practiced medicine and surgery since 1885, was a graduate of a regular allopathic school of medicine and

surgery, the University of Austria, and stood the examination before the State Board in Texas, and has a private sanitarium on a small scale at Taylor; he exhumed the body of the deceased about six months after it was interred; the body was considerably decomposed and on this account he was not enabled to give a better detail of the claimed wounds he found; he found the lower jaw broken—shattered, broken in three places. On account of putrifaction he could not tell further about the mouth wound; he found a bullet in the region of the third latteral of the spine, about an inch to the left in what he called the muscle, but nothing but the decomposed mass. That was the bullet that entered the mouth; then there was the entrance wound of a bullet lower down which was ragged and showed it was the entrance, because the entrance is always more ragged than the exit, and that bullet went in an upward direction; went along the spine, fracturing a part of the spine, about the fourth or fifth vertebrae, and entered the sac of the heart; that bullet would necessarily produce death; he could not state whether the first bullet would have produced death, as he was unable to tell what organs were punctured, or whether any of the large blood vessels had been perforated by the bullet in the direction of it, on account of the putrifaction, but he was positive the second bullet would have caused instant death. He procured and had the bullets.

The record also shows that the defendant introduced the witness W. A. Barlow, an attorney, who testified in English, and who testified about the appellant consulting him in talking with him about procuring a divorce from his wife. We think it unnecessary to detail this witness' testimony.

The appellant's attorneys cite us to no authority for the exclusion of the testimony of these witnesses on the ground claimed except article 1, section 10, of the Bill of Rights of our Constitution, and quotes therefrom, as follows: ". . . The accused . . . shall be confronted by the witnesses against him," and article 24, Code Criminal Procedure.

We have been unable to find any statutory provision requiring that all pleadings and court proceedings shall be in the English language. We take it that no such provision would be necessary; that it would go without saying that all proceedings, in our courts of every character whatsoever, should be in the English language and no other. Article 796, Code Criminal Procedure, provides: "When a witness does not understand and speak the English language, an interpreter must be sworn to interpret for him," and it also provides that such interpreter may be subpoenaed and required to attend just as any other witness.

It will be noted that this bill of exceptions shows that the motion was made after all of the testimony was in. It fails to show that the court was in any way requested, before this time, to furnish the appellant, or his attorneys, with any interpreter for any purpose what-

ever. Doubtless, if this had been requested, the court would and should have granted the request and furnished the defendant and his attorneys with an interpreter, if they or either of them deemed one necessary or proper, and would and should have given a sufficient time for the interpretation of the testimony of any or all of these witnesses and for a consultation between the appellant and his attorneys in everything pertaining to the testimony of these witnesses. The testimony of these witnesses was to such facts that it is altogether improbable that the appellant could have in any way assisted his attorneys by suggestion, consultation or otherwise. It is, therefore, our opinion that no error was committed by the lower court in refusing to grant the appellant's motion to exclude the testimony of these witnesses, as shown by this bill of exceptions.

It is further our opinion that this constitutional provision which says that the accused shall be confronted by the witnesses against him, neither by its letter nor its spirit, could be construed, under the circumstances of this case, and as shown by this bill of exceptions to be violated or that the accused was not confronted by his witness on the trial of this case. We have been unable to find where this question, raised by this bill, has been discussed or decided by any of the courts.

4. One of the grounds of appellant's motion for new trial is that the indictment is insufficient in that the prosecution is not begun as is prescribed by the Constitution of this State, nor does said indictment allege that Lula Zunago was a reasonable creature in being.

We have given a copy of the indictment in the first of this opinion. It is in substantial compliance with the requisites of an indictment as prescribed by our law (see Code Criminal Procedure, article 439; also White's note, 338 thereunder), and is substantially in conformity with the form prescribed by law and that laid down and uniformly followed in such indictments. Code Criminal Procedure, article 458. All of the cases, beginning with English v. State, 4 Texas, 125, down to the present time, have held indictments substantially as this is, amply sufficient. The appellant does not show in his motion, or otherwise, in what the claimed defect in this indictment is, other than as stated above. It is our opinion that the indictment is sufficient. It is not necessary for the indictment to allege that Lula Zunago "was a reasonable creature in being." This has been uniformly held from at least, as early as Perryman v. State, 36 Texas, 321, down to and including Ringo v. State, 54 Texas Crim. Rep., 561.

5. The motion for new trial complains of an action of the district attorney when arguing the case. This matter is not shown by any bill of exceptions and we can not consider it for that reason. The motion does not show any such act even with a bill of exceptions, which would justify this court in reversing this case.

6. The sixth ground of appellant's motion for new trial is as follows: "The court erred in his charge to the jury, as follows: (a)

Because the definition of malice as set forth in said charge is confusing and misleading, and not a sufficient description of said term; (b) in inserting in said charge eight lines, containing eighty-three words wherein the court set forth the law of self-defense, and then taking a pen and scratching out the same, leaving said scratched out charge in the charge as read to the jury and delivered to them; (c) said charge is inadequate in that it fails to charge on self-defense, because the testimony in the case raises such issue; (d) said charge is insufficient in that in the portion wherein the offense of manslaughter is defined, the court failed to instruct the jury as to what in law is deemed 'adequate cause;' (e) in defining the punishment for murder in the second degree, on page 6 of its said charge the court erred therein by scratching out with a pencil the words 'and not in defense of himself against an unlawful attack, reasonably producing a rational fear or expectation of death or serious bodily injury,' because said words are still easily discernible to the jury, and can be readily deciphered, and such action of the court in leaving said words in said charge where they can be read, may have been prejudicial to the defendant's defense; (f) because the court allowed the words referred to in section 'e' of this assignment just above to also be in the said charge, and be partially eliminated by scratching over with a lead pencil, on page 8 of said charge; (g) because the court erred on page 9 of its said charge in instructing the jury that unless they found that said Lula Zunago was dead, and that defendant unlawfully killed her, they should find him not guilty, because there was no controversy, but that said Lula Zunago was dead, and the uncontroverted testimony was that said person was dead, because the giving of such charge may have been prejudicial to this defendant; (h) because the court erred on page 10 of its said charge in not fully giving the theory of this defendant in charge to the jury, but only giving a part of said theory in charge to the jury, thus depriving the defendant to a certain extent of a part of his defense."

We think it is unnecessary to give the charge of the court in this case, or any part of it, as complained of by appellant under this ground of his motion. The original charge has been sent up for our inspection and we have inspected it. We have also considered all of the objections to said charge enumerated in the above ground. In our opinion there is no such defect therein, nor is the charge so erased as to in any way injure the rights of the appellant. The erasures complained of therein are with reference to self-defense. How this could injure the appellant we do not understand. It seems to us that instead of being an injury, if the jury could have read or considered it, which we think is neither shown and is altogether improbable, it would have been more likely to have inured to his benefit than to have affected him in any way injuriously. It will be seen that some of these complaints shown by this ground of appellant's motion for new trial are in such shape as not to point out any defect in the

charge which we could consider, but we have considered them all and have concluded there is no injury to the appellant that would justify us in reversing this case. The court's charge is full and correct on murder in the first and second degree, defining all terms necessary, manslaughter, adequate cause, reasonable doubt generally, and between degrees, accidental killing and presumption of innocence.

As to that part of the complaint which claims that the court ought to have charged on self-defense, it is our opinion that there was no evidence whatever in the record that either called for or would have justified the court in giving any such charge. The appellant in his testimony does not even hint at having himself killed the deceased in self-defense and claims that he did not shoot her, but he claims that in the struggle for the possession of the pistol she was accidentally shot. The court submitted accidental shooting in an appropriate charge to the jury to which there is no complaint by appellant.

7. Another ground of the motion for new trial is that the verdict is insufficient and uncertain in that it is not the verdict of the jury. The verdict is as follows: "We, the 'juor,' find the defendant guilty of murder in the first degree, and assess his punishment at death. C. F. Faubeon, Foreman." In our opinion the verdict as it is, is clearly sufficient and there is no uncertainty about it; but, in addition to this, the judgment shows that when the jury were ready to return their verdict they were brought into open court by the proper officer, "the defendant and his counsel being present, and being asked by the court if they had agreed upon a verdict, answered they had and returned to the court a verdict, which was read aloud by the clerk and thereupon the defendant requested that the jury be polled and said request being granted each juror's name was called and asked if this was his verdict, to which question each juror answered this was his verdict." Whereupon said verdict was entered upon the minutes of the court.

8. Another ground of appellant's complaint is that the court erred in allowing and permitting the sheriff, during the progress of the trial, to bring the appellant into the courtroom before the jury at divers and different times and to take him from the courtroom in the presence of the jury in a manacled and handcuffed condition and to lead him into and from the courtroom by a chain attached to said handcuffs, the chain being held by the sheriff or his deputies, because said acts and manner or leading him in the presence of the jury may have been prejudicial to him and may have prejudiced his cause before the jury. This ground of the motion is not shown by any bill of exceptions and can not, therefore, be considered by us. We take it that because it is not by bill of exceptions that it may not have occurred at all, or if it occurred it was only in such way as that it was necessary and a proper precaution by the sheriff under the circumstances. We do not mean, by implication even, to sanction the practice of sheriffs, if such is the practice, of carrying any prisoner

into and out of the courtroom in the presence of the jury manacled and handcuffed and chained, but on the contrary, we would condemn such a practice, if it was properly shown to have occurred and have been unnecessary and improper in any given case. The complaint even in this ground of the motion for new trial, does not attempt to show any injury to the appellant on this occasion, but it simply says that it *may* have prejudiced his cause before the jury. There is no such matter shown to us in this as would justify us in reversing this case.

There is no reversible error in the record and we must, therefore, affirm this case.

*Affirmed.*

[Rehearing denied June 23, 1911.—Reporter.]