## ABBIE MOUTON V. STATE.

No. 24728. April 19, 1950.
On Motion to Reinstate Appeal May 24, 1950.
Rehearing Denied January 24, 1951.
Appellant's Second Motion for Rehearing Denied February 14, 1951.

*Frank Adams* and *Stanley Plettman*, Beaumont, for appellant.

*George P. Blackburn*, State's Attorney, Austin, for the state.

WOODLEY, Judge.

Appellant was found guilty by the verdict of a jury of murder as charged in the indictment, the punishment being assessed at death.

No judgment is found in the record, in the absence of which this court is without jurisdiction of the appeal. See Aguillar v. State, 153 Tex. Cr. R. 509, 221 S. W. 2d 242; Davis v. State, 145 Tex. Cr. R. 188, 167 S.W. 2d 523; and Berry v. State, 138 Tex. Cr. R. 563, 138 S.W. 2d 105.

The appeal is therefore dismissed.

Opinion approved by the court.

### ON MOTION TO REINSTATE APPEAL.

GRAVES, Judge.

The record having been perfected, the appeal is reinstated and the case will now be considered on its merits.

It is shown in the testimony that the deceased was a toothless and blind man, about 80 years of age; that he lived in a shack near Helbig, in Jefferson County. He was an old-age pensioner, and appellant had been living with him just prior to his death. Appellant, who was a 31-year-old Negro, had been married and was the father of five children. Neighbors of the deceased, who had not seen him for about two weeks, called the attention of the authorities to such fact and they entered his shack and found evidence that it had been rifled. They then searched the surrounding jungle, and in a shallow grave, they found a human body, evidently having been stripped of flesh by hogs, dogs and other wild animals. This body bore evidence of foul play, the skull being crushed, and the top being torn off. It was identified as that of the deceased.

Appellant fled and went to California, later returning to Galveston, Texas, where he was apprehended. He made a full confession relative to this matter, and in company with peace officers, he repaired to the scene and showed them where he had thrown the shovel with which he dug the grave, where he had thrown the axe which he had used in striking the old man, as well as the stick which he had used in making the assault, and his jumper. He also demonstrated the position in which he had placed the body in the grave. Pictures of appellant were made as he illustrated this killing, and indicated how it was done as well as pictures of the grave and the surrounding terrain. Such pictures were introduced in evidence, just for what reason is not shown, but over the objection of appellant's court-appointed attorneys, who are commended for their diligence in the trial.

Appellant, while in Beaumont and previous to said trip, had made a full and complete statement in writing occupying seven and one-half typewritten pages in the statement of facts, and to the introduction of such statement no objection was offered. However, in order to show the gruesomeness and brutality of this offense, we quote the portion of such statement which is deemed material to this charge:

"I got to thinking about the fact that I needed some money and that I knew Andrew Dorsey had some money in his house. I thought about the money for about 45 minutes, and I decided that I would go over and kill Andrew Dorsey and take his money. I had planned while sitting there thinking about it that I would hit him in the head. I knew he couldn't see me because the old man was blind. I also knew the old man was about seventy years old. I left the train station and started back to Andrew Dorsey's house. Before I got there, I went around to the back of the

house and I picked up a piece of pine sapling about 2 1/2 feet in length and about two inches through the center of it. I then walked around to the front of the house and went in the front door. I slipped in the front door and Andrew Dorsey did not even know I was there. He was sitting on the bed on the right side of the room. I tip-toed up to him with the stick in my hand. I stood by him a minute and looked at him. I was deciding where would be the place to hit him. I decided the best place to hit him would be the temple. I am left-handed and I hit Dorsey on his right temple. When I hit him he fell back on the bed and groaned. He was *laying* back on the bed with his head to the left and I hit him two times more in the same place. He had quit making any noises at this time. Part of the stick broke off. I then searched him while he was on the bed. I found $25.00 on him stuck in his sock. Dorsey had on a pair of green trousers, a heavy undershirt with the sleeves torn off, and a pair of black shoes, and suspenders. He also had on a woman's red belt. Blood was running out of his nose, but I do not know if any of it got on the floor or not. I think I laid the *stock* on a little round table. I then picked the old man up and put him on my shoulder. I then started out the room through a door to go into the kitchen. There was a sharp-shooter shovel lying there and I picked it up. I then went out the back door. I had already made up my mind *whiel* I was at the Santa Fe Depot to kill the old man and take him out in the back and bury him some place in the woods. I went out a trail to the toilet and then out off to the right about 25 feet from the toilet. I cut off the trail about 25 feet and I laid Dorsey down because he was getting heavy. I laid the shovel down and walked to the house. I went back to the house to get an axe because the old man was coming to and I wanted to make sure he didn't come to his senses and live. The axe was lying near the bed in the back room where I slept. The axe had a single blade with home made handle. I picked up the axe and also got my clothes. I then went around the house and locked the front door with a pad lock from the outside. I then went back around to the rear of the house. I got my axe and the clothes that I had laid down and started back out to where I had put Dorsey. I then took my old clothes and threw them in the bushes because I didn't want to leave any of my stuff in the house. I wanted to get rid of the old clothes. I picked up the axe and the shovel. The sharp-shooter shovel did not have any handle at all in it. I carried them on out to a spot amongst some persimmon trees. I started digging. I dug a hole about 18 inches *deed* and about four or five feet long. I then went back to get Andrew Dorsey. He was breathing but he wasn't saying anything. I picked him up and carried him to where I had dug

the grave. When I got to the grave I put Andrew Dorsey in it with his head to the north and his feet to the south. I had dug the grave pointing north and south. When I put him in the grave I laid him on his right side. He was still breathing. I then took the axe and with my left hand I hit him in the forehead with about a half swing. I then hit him again in the same way. I looked at him again and he was gasping for breath. I then pulled off his shoes and the reason for this was that I didn't want him to die with his shoes on. I put the shoes in the grave with him. I then covered him up. There was also a can of Prince Albert Smoking Tobacco in the grave. After covering his head up and down to his knees I stood there for awhile. Dorsey's feet were out of the grave. I then sung a song called 'When I Die You Can Bury Me On The Lone Prairie.' I then threw the sharp-shooter in an eastern direction from the grave. I then took the axe back to the house with me and threw it on the south side of the house in some bushes. I threw the jumper in the bushes on the south side of the house. I had put on a long sleeve sport shirt and a brown cap. I forgot to mention the fact that the reason I locked the front door was to make people think Dorsey was gone out of town. When I left the house it was about 3:30 or 4:00 o'clock. I was going toward Taft Robinson's place and I met my brother, Buster Mouton, Willard St., in a borrowed car. He stopped and I *ask* him where he was going. We went on back to Taft's place and I bought some beer. We then went to Voth, Texas, and went to Neva's Place and drank some beer. Buster Mouton and his wife then left. I stayed at Neva's Place till around 7:00 o'clock and then rode into town with some boy I didn't know. He let me out on Gladys St., and I ran into some fellow I didn't know and we bought a pint of whiskey. I met some gal and went out to spend the night. I stayed with her till about 6:00 o'clock and I was drunk. The city officers arrested me that same morning. I stayed in the City Jail till Tuesday and Mrs. R. W. Cobb got me out. I then went over on Forsythe St. and got to drinking with a boy by the name of Otis Fontenot. He then left after we had a bottle of beer. I then met James Cooper and Travis Williams. We got to drinking together. I then told them I had killed a man and had to leave town. They said they didn't believe me. I left them. I later ran into a fellow whom I had never seen before. He *ask* me to ride a freight train with him to California. I said *okay* so we caught the train to Houston, San Antonio, El Paso, then on out to Oakland, California. I met a boy from Beaumont, Texas, named Bubba Wheat. He had some money so we started drinking. I don't know where he lives or where he works. I stayed in Oakland, California,

about two weeks and then decided to come back to Texas with the intention of going to Winnie, Texas, and hide out. When I got to Galveston, Texas, it was Tuesday, August 30, 1949. I stayed in Galveston, Texas, till I was arrested about 12:00 the same night. * * * I have been shown a sharp-shooter by Mr. Russell Bridges of the Sheriff's Department and it is the same shovel that I used to dig the grave in which I put Andrew Dorsey. I have also been shown a pine stick sapling by Mr. Bridges and it is the same one I used to hit Andrew Dorsey with. I would like to say that Andrew Dorsey did not try to harm me in any way."

All save two of appellant's bills of exception relate to the fact that soon after the written statement was made, a deputy sheriff took appellant to the scene of the offense and there appellant re-enacted the killing of this old man, showing the officers where he had disposed of the shovel, as well as where the axe had been thrown, also where his jumper could be found; and such articles were then and there found by the officer. Up to this point we find no difficulty in holding such testimony to be admissible, as the finding of matters that conduce to establish appellant's guilt, under Art. 727, C.C.P. However, in an excess of caution rather than to depend upon the officer's power to depict in words such actions of appellant, he was caused to stand in the position in which he claimed to have been when he first struck the deceased and demonstrate the manner in which he delivered such blows. Again, he was taken to the spot where the axe was found and there he pointed out the spot where the same was hidden. Again, he was taken to the grave and demonstrated how he had there disposed of the body. Pictures were taken of all of these attitudes and introduced in evidence over the strenuous objections of appellant's attorneys.

The trial court qualified these bills by saying that appellant's only plea was that of insanity, and lack of mentality to know the right and the wrong of the matter, and an inability to know and remember ordinary occurrences; that months after such killing, the accuracy of his memory of the transaction and the ability to re-enact the same in this wooded terrain might have some bearing on such mental condition.

We do not think these pictures were necessary nor useful in the trial of this cause. We see no reason therefor, nor do they tend to solve any disputed issue herein. While we will not, and do not, speculate as to the injury in a death penalty case,

there must be some probability of injury being shown before we should reverse on an alleged error.

There is but one sinister-like fact obtruding itself in these pictures, and that is the fact that in some of them appellant appears with handcuffs on his wrists. It seems that he had just finished this lengthy written statement and an officer had driven him out to the scene of the crime and had seen fit to place the handcuffs on him. If this would uselessly inflame the minds of the jury, one is led to think that this cold-blooded confession in all of its gruesome details was so persuasive to a jury's mind that the mere fact of seeing a picture of appellant would fade into insignificance in the presence of the hereinabove quoted statement, no denial of which had ever been made, nor any defense offered save that of insanity.

These pictures should not have been offered herein, but we see no harm that could have resulted to appellant in the glaring light of his studied, undenied statement of his killing of an old blind man for the purpose of robbing him of his recently received old-age pension. The matter of these pictures has received much consideration, and we do not in any wise condone such a useless exhibition thereof, but in this instance, we see no harm that could have been done to the appellant.

There is a further motion herein to quash the indictment because it is alleged that the same is vague, indefinite and uncertain and charges no offense against the law. Count No. 2 therein alone was submitted to the jury and reads as follows:

"AND THE GRAND JURORS AFORESAID, upon their oaths aforesaid, do further present in and to said Court that Abbie Mouton, on or about the 31st day of July, A.D., 1949, and anterior to the presentment of this indictment, in the County of Jefferson and State of Texas, did then and there unlawfully, voluntarily, and with malice aforethought, kill Andrew Dorsey, by then and there striking and beating him, the said Andrew Dorsey, in and on the head with a stick or piece of wood, and by then and there striking and beating him, the said Andrew Dorsey, in and on the head with some instrument and weapon to the grand jurors unknown."

The main portion of such charge objected to is the phrase, "by then and there striking and beating him, the said Andrew Dorsey, in and on the head with a stick or piece of wood," etc. We think such phrase is used only in designating the kind of stick or piece of wood, and both statements relate to the same

thing, and being, among other things, but a designation of only one of the various things used in taking the life of the deceased, both relating to a stick or piece of wood. We think the objection to such indictment is not meritorious and is overruled.

While not condoning the introduction of the pictures in this cause and confessing our inability to see any benefit to the state, we see no harm resulting to the appellant by such introduction. We have held that the introduction of pictures in such trials should not be countenanced where they serve no legitimate purpose and where same might be used to, and were calculated to seriously inflame the minds of the jury and might have a tendency to cause a more onerous verdict than the facts call for or justify. However, in this instance, we have quoted rather fully from appellant's own statement relative to the facts as taken from his unobjected to written statement, and we have become convinced that the mere showing in a picture of the bodily position of appellant, while pointing out the weapons used, and the method of their use, was not as inflammatory as the sordid details of this offense as shown in his written statement relative thereto.

This statement shows a deliberate and premeditated crime for the purpose of robbing a blind, toothless old man, and an intent to take his life in order that the offender might not be known. We think that the admissible statement made to the officer by appellant could be related by such officer from his memory. Then, if material, we see no reason why the actual occurrence, as shown in a proper picture, should warrant a reversal herein. See Gibson v. State, 153 Tex. Cr. R. 582, 223 S.W. (2d) 625; Housewright v. State, 154 Tex. Cr. R. 101, 225 S.W. (2d) 417.

The judgment will be affirmed.

ON MOTION FOR REHEARING.

WOODLEY, Judge.

Appellant insists that, inasmuch as this is a death penalty case and the pictures of him taken at the scene of the killing and at the place where the body of the deceased was found were improperly admitted in evidence, we should hold the introduction of such pictures to constitute reversible error.

As pointed out in the original opinion the only sinister-like fact reflected by the pictures which could be said in any

case to be of an inflammatory and prejudicial nature, is that appellant is shown with handcuffs on his wrists.

The rule is well settled that it is improper for an accused to be tried or brought into the courtroom or into the view of the jury or jury panel while handcuffed. This is upon the theory that the jury might thereby conceive a prejudice against the accused as being, in the opinion of the court or officers, a dangerous man and one not to be trusted even under surveillance of officers. See Zunago v. State, 63 Tex. Cr. R. 58, 138 S.W. 713; Gray v. State, 99 Tex. Cr. R. 305, 268 S.W. 941; Rainey v. State, 20 Tex. App. 455.

But this court has recognized that an accused may be tried without removing his shackles where the trial court, in the exercise of a sound discretion, believes it necessary in order to prevent the escape or self-destruction of the prisoner, or to prevent him from injuring bystanders or officers of the court, or if necessary, to maintain a quiet and orderly trial. The trial court's action in this regard being subject to the closest scrutiny and review by this court. See Gray v. State, 99 Tex. Cr. R. 305, 321, 268 S.W. 941, 949.

Applying such rule and the exceptions thereto, this court has declined to order reversal even in death penalty cases, on the ground that the accused was brought into the presence of the jury handcuffed, in the absence of a showing of injury or prejudice to the accused. See Stockton v. State, 148 Tex. Cr. R. 360, 187 S.W. 2d 86 (death penalty); Canon v. State, 59 Tex. Cr. R. 398, 128 S.W. 141 (death penalty); Powell v. State, 50 Tex. Cr. R. 592, 99 S.W. 1005 (death penalty); Burks v. State, 50 Tex. Cr. R. 47, 94 S.W. 1040; Zunago v. State, supra, (death penalty); Gray v. State, supra, (death penalty).

If the jury, upon seeing appellant pictured in handcuffs, were impressed by such fact, the impression would be that in the opinion of the officers, appellant was not to be trusted even under their watchful eye.

Insanity being the sole defense, the reasoning that the jury might conceive a prejudice against the accused seen in handcuffs, as being a dangerous criminal in the eyes of the officers fails. The jury could as well consider the handcuffs as supporting the view that the officers considered him irresponsible by reason of his mental condition.

We remain convinced that there is nothing in the pictures, or in the fact of their admission in evidence, which could have militated against appellant's defense, or caused or contributed to cause him to receive a more severe penalty than would have been assessed if the pictures had not been offered.

Appellant complains also that we failed to discuss his Bill of Exception No. 7.

This bill complains of the testimony of the witness Bridges who was present at the making of the confession which was reduced to writing, and who thereafter took appellant to the scene of the killing and the place where the deceased's body was found.

The objection, according to this bill, was to all of the testimony of this witness as to what appellant showed him and what he found on the visit to these scenes, and to the pictures taken of appellant on the occasion and the witness' statement in regard to such pictures. However appellant, in his brief, directs special attention to the following testimony of the witness in connection with one of the pictures.

"S-17 shows me sitting on the bed with defendant above me. That's the way defendant told me deceased was sitting at the time he first hit him."

It is contended that the evidence objected to, and especially the foregoing quoted testimony, refers to a new and different confession testified to have been made by appellant to the witness at the time the pictures were taken.

The bill of exception shows that appellant objected to much of the testimony of this witness which was undoubtedly admissible, such as the finding of the axe where appellant said he had placed it, the shovel that he said was used by him in digging the grave, and the jumper that appellant said he wore at the time of the killing and threw away.

A part of the evidence objected to being admissible, the bill is insufficient to show reversible error. See Cagle v. State, 147 Tex. Cr. R. 354, 180 S.W. 2d 929; Branch's Ann. P.C., p. 135, Sec. 211.

In any event, we are unable to agree that the testimony "That's the way defendant told me deceased was sitting at the

time he first hit him" referred to a statement of the witness then made.

As we view it, the testimony had reference to the prior statement of appellant which was heard by the witness. The bill shows that the witness was present in the district attorney's office, talked with appellant, and saw him sign the confession; that appellant told the witness where he had thrown the axe, shovel and jumper, and upon arriving at the scene, appellant "in chronological order" showed him where deceased was sitting on the bed when he first hit him with the stick, where there was a "sharpshooter blade" he had picked up, showed him where he laid the deceased and showed him the grave. Thereafter the witness found the axe, and the blue denim jumper he had not found before.

The testimony as to the statements of appellant, a part of which were found to be true by the finding of the articles referred to, including the statement as to where the deceased was sitting when first hit, therefore became admissible.

Appellant's motion for rehearing is overruled.

Opinion approved by the court.

### APPELLANT'S SECOND MOTION FOR REHEARING.

MORRISON, Judge.

Appellant urges this court to discuss whether or not the pictures, or any of them, offered in evidence amounted to a confession of guilt on the part of appellant. The original opinion herein expressed some doubt as to the propriety of the introduction of the pictures. This doubt was predicated, not upon the grounds that such pictures constituted an extra judicial confession, but because they served to solve no disputed issue in the case. These pictures do not say of themselves: "I killed the deceased." It is quite conceivable that such a picture could be taken but we hold that these do not come within that category. This court in its two opinions heretofore written in this matter has held that the only sinister factor in the picture grew out of the fact that appellant appears in handcuffs. We feel that we properly disposed of this question in our opinion on motion for rehearing.

Appellant's second motion for rehearing is overruled.