EX PARTE A. F. COLE.

No. 6278.   Decided April 20, 1921.

**Murder—Habeas Corpus—Bail—Practice on Appeal.**

Where, upon appeal from a *habeas corpus* proceedings, denying relator bail, the facts in the case were such as not to authorize the court to reach the conclusion that a jury would under the present state of the record assess the death penalty, relator is entitled to bail.

Appeal from the District Court of Smith. Tried below before the Honorable J. R. Warren.

Appeal from a *habeas corpus* proceedings denying relator bail; bail granted in the sum of $5,000.

The opinion states the case.

*Bulloch, Ramey & Storey,* for relator.

*R. H. Hamilton*, Assistant Attorney General, for the State.—Cited Ex Parte Jones, 31 Texas Crim. Rep., 422; Ex Parte Young, 222 S. W. Rep., 242; Ex Parte Sapp, 179 id., 109.

HAWKINS, JUDGE.—Complaint was filed against appellant, charging him with the murder of one Elenora Bell. He sought release on bail through *habeas corpus* procedings, and upon being remanded without bail, he prosecutes this appeal.

The record discloses that appellant and the deceased had, for quite a long time, been living together in the same house, with the two sons of appellant. On the night the killing occurred his two boys were at a neighbor's house not very far away. While there the report of a pistol at their father's house was heard, and a short time afterward he called one of the boys by name, telling him to come there quick. All of the parties to this transaction were negroes; and Joella Fleming was informed in a few minutes by one of the boys that deceased had been killed, and she immediately went to the house of appellant. Deceased was found out in the yard, near the smoke house, having on no clothing at the time, except a short shirt, being entirely nude from the waist down. Appellant did not testify on the *habeas corpus* trial, but his statements explanatory of the killing were introduced through a number of witnesses. He claimed that when he went to bed he put his pistol on a chair, and that when deceased started to come to bed she picked up a garment of some kind on the chair, jerked the pistol out on the floor, when it was discharged and shot her. Some of the witnesses modified this statement on cross-examination to the extent of saying that he, appellant, claimed he supposed that was the way it was, that he did not know exactly. An examination of the body of deceased disclosed that she was shot near the center of the back; and bullet holes were discovered through the door leading out of the room in which the shooting is supposed to have been done, and passing into another door on the other side of an adjoining room. The bullet hole in the first door was some higher than the one in the second. The State introduced this testimony to combat the theory that the shooting was accidental, and in the manner claimed by appellant, on the theory that the range of the bullet was downward instead of upward, as it would necessarily have been if the pistol had been discharged on the floor. There is no testimony in the record showing whether these bullet holes, upon which the State laid great stress, were, or not, in the doors prior to the night of the killing, although one of the sons of appellant who lived at the house was on the witness stand and perhaps could have testified in regard to the matter had he been asked. One witness. who was examined with reference to these holes, in the doors, stated that it was impossible for him to tell whether the holes had been there a week, a month or two months; that they looked to be fresh, but being inside the house, they would not be exposed to the weather conditions, and, therefore, it would be impossible to tell the age of the holes.

It is disclosed from the record that appellant was paying attention to another colored woman in the neighborhood, by the name of Lena Cheesborough, with whom he seems to have spent a greater portion of the last two or three days and nights before the killing. She testified that appellant had requested her to marry him, and insisted on her setting the day, which she had declined to do because of the presence of deceased at his home, and had told appellant she would not marry him as long as she was there, to which appellant replied that deceased would not be in the way; that she was going to leave. The State introduced this testimony on the theory that it showed motive on the part of appellant to kill deceased, but appellant met this testimony with proof that deceased had already declared her intention of leaving his house and farm, and had rented a house in Overton with the avowed purpose of going there and cooking for the railroad section hands, and that, therefore, it was not necessary, even had appellant desired her out of the way, to have resorted to the extreme measure of killing her, as she intended to leave anyway.

If appellant's theory of an accidental shooting is accepted, of course he would be entitled to bail, if his theory is rejected, we have an unexplained killing, with nobody present but appellant, and no witness to testify as to the facts and circumstances leading up to the shooting. Before our law was amended, eliminating the degrees of murder, this condition would have made it necessary for the trial court to have submitted to the jury the issue of second degree murder, and in determining whether or not a case is bailable the decisions of our court before the change in the law may be looked to. Without citing the cases, we deem it sufficient to say that we do not believe the facts in this case are such as to authorize us to reach the conclusion that a jury would, under the present state of the record before us, assess the death penalty, and, therefore, appellant is entitled to bail.

The judgment of the trial court denying bail is reversed and appellant's bond fixed at five thousand dollars.

*Bail granted.*