## G. W. Stephens v. The State.

No. 6769.   Decided March 29, 1922.

Rehearing overruled December 20, 1922.

**1.—Murder—Grand Jury—Special Judge.**

The contention that the grand jury who indicted defendant was selected by a special judge, and at a special term of the District Court was without authority has been adversely decided against the defendant. Following Ex parte Holland, recently decided.

**2.—Same—Oath of Jury—Practice in Trial Court.**

The complaint that possibly some juror who tried defendant's case, desired to affirm but not to be sworn, is untenable, there being no objection by the jurors to the usual form of oath.

**3.—Same—Evidence—Bill of Exception.**

In the absence of information in the bill of exceptions of the incorrectness of the court's conclusion as to the question propounded to the witness as to the position of the deceased, no error is presented.

**4.—Same—Evidence—Possession of Pistol.**

Upon trial of murder there was no error in admitting testimony that when arrested defendant was found in possession of a pistol and scabbard, this occurring a few minutes after the shooting.

**5.—Same—Evidence—Memorandum—Refreshing Memory of Witness.**

There was no error in overruling the objection and permitting the physician who testified as to the wounds, who asked permission to refer to a memorandum to refresh his recollection from a document, the correction of which he had verified at or about the time of the incident; besides, the bill of exceptions was insufficient.

**6.—Same—Evidence—Declaration of Third Party.**

There was no error in overruling an objection to the testimony of a daughter of deceased who was asked if she knew whether or not her father had a pistol; if she knew this fact she could testify thereto.

**7.—Same—Sufficiency of Evidence—Requested Charge.**

Where, upon trial of murder, the evidence was sufficient to sustain the conviction assessing the death penalty, there was no error in overruling defendant's request for an instructed verdict.

**8.—Same—Argument of Counsel.**

Where the argumeent is not *per se* so inflammatory or abusive as to necessarily injure the rights of the accused, the same is not reversible error in the absence of a requested charge to withdraw the same, and where the State's attorney said, "A bad murder has been committed in our county, and that is enough to make any jury bring in a verdict of death," in the meantime holding up and exhibiting a certain cartridge, there is no reversible error.

**9.—Same—Argument of Counsel—Other Transactions.**

There was no error in not permitting appellant's counsel, in his argument to the jury, to narrate certain facts claimed by him to have transpired during the progress of the trial of a case in McLennan County, which had occurred within counsel's knowledge and experience, not connected with the trial of the instant case.

**10.—Same—Bill of Exceptions—Charge of Court—Practice in Trial Court.**

An objection to the court's charge raised for the first time in a motion for a new trial is not sufficient to present any question relative thereto. Such exception should have been taken before the argument began.

**11.—Same—Form of Verdict—Bills of Exception.**

Appellant's bill of exception to the form of the verdict, attempting to raise the question that said verdict is not responsive to the evidence should not have been received and considered by the trial court under the record of the instant case.

**12.—Same—Special Venire—Practice in Trial Court.**

Where it was not shown how the failure to have the full number of veniremen drawn, present and available, from which to select the jury to try appellant injured him, there was no reversible error.

**13.—Same—Sufficiency of the Evidence—Death Penalty.**

Where, upon trial of murder assessing the death penalty, the evidence was sufficient to sustain the conviction, there is no reversible error.

**14.—Same—Rehearing—Express and Implied Malice—Statutes Construed—Death Penalty.**

Since the abolishment of the degrees of murder it has been held that in determining whether a case is bailable, the evidence should show express malice, but such showing is not necessary under the present statute abolishing the degrees of murder upon final trial, and the death penalty may be inflicted by the jury where implied malice is shown, and the evidence sustaining the conviction, there is no reversible error.

Appeal from the District Court of Bexar. Tried below before the Honorable W. W. Walling.

Appeal from a conviction of murder; penalty, death.

*J. W. Conger,* for appellant.

On question of the insufficiency of the evidence and assessing death punishment: Williams v. State, 174 S. W. Rep., 1042.

*R. G. Storey,* Assistant Attorney General, for the State.

LATTIMORE, JUDGE.—Appellant was convicted in the District Court of Bexar County of murder, and his punishment fixed at death.

A strong presentation is made on behalf of appellant of the fact that the grand jury that indicted him was selected by a special judge and at a special term of the court. The same question has recently been decided by us and with reference to the identical judge and court in Ex parte Holland, No. 6713, and because of the fact that the subject was fully discussed and decided adversely to appellant, we content ourselves with reference to that case for a decision on this point herein. For the reasons stated in the Ex parte Holland case, *supra,* we conclude no error is shown by appellant's bills of exception, Nos. 1, 2 and 3 complaining in various ways of the lower court's action in overruling his motions to quash the indictment.

By bill of exceptions No. 4 appellant complains of the fact that the oath was administered to the jury in the usual form. The complaint seems based upon some assertion that possibly some juror desired to affirm, and not be sworn. We do not think the matter tenable. Had any juror selected upon the venire panel so desired and have indicated this to the trial court, he would have been permitted to affirm. No objection having been made by any of said jurors, we must conclude that an oath in the usual form was satisfactory to them and accepted by them as binding upon their consciences.

By his bill of exceptions No. 5 appellant complains of the fact that the State was permitted to ask a witness this question: "What part of his body was toward Stephens when he shot him on the front gallery there, his back or his face?" The complaint is that this is an assumption of the fact that deceased was in fact shot by appellant. The court overruled the objection, stating that there was sufficient evidence before him to enable him to know that the objection was groundless. We are not informed by anything in the bill of the incorrectness of the court's conclusion, and in this condition of the record no error is presented. This court's universal rule is to uphold the action of the lower court in any specific ruling unless the bill shows its error.

When arrested appellant was found in possession of a pistol and scabbard. Both these were offered in evidence by the State. He was arrested a few minutes after the shooting. We see no ground of objection to the introduction in evidence of said objects.

A physician who examined the body of deceased shortly after the homicide was asked how many bullet wounds he found thereon. Witness asked permission to refer to a memorandum which he had in

order to refresh his recollection. Appellant objected to the memorandum because not made by the witness. The witness stated that he made pencil notes of the number and location of the wounds at the time he examined the body, and that said pencil memorandum was made the basis of a typewritten statement thereof, this being the document now in the possession of said witness, the correctness of which was verified by him after it was written and when it was returned to him on the same day or next day after the homicide. There was no error in overruling the objection and permitting the witness to refresh his recollection from a document whose correctness he had verified at or about the time of the incident. The bill of exceptions in any event would be insufficient as it does not show what the testimony of the witness was after the objection of the appellant to his refreshing his recollection was overruled.

No error appears in bill of exceptions No. 9 wherein is presented appellant's objection to the testimony of a daughter of deceased who was asked if she knew whether or not her father had a pistol. If the witness knew the fact she was competent to testify thereto, and an objection that he may have bought one without her knowledge or may have had it in some place unknown to her, would not suffice to reject the testimony. The same hypothetical objections might be made to a statement made by any witness of facts said by him to exist within his knowledge.

The trial court did not err in overruling appellant's request for an instructed verdict. A review of the entire evidence in the case has satisfied us that not only was the guilt of the accused sufficiently proven to take it to the jury but that the jury's verdict in finding him guilty is also supported and justified by the evidence.

The bill of exceptions to a remark of the State's attorney to the jury in his argument, which remark is not *per se* so inflammatory or abusive as to necessarily injure the rights of the accused, would present nothing for our consideration in the absence of a request on the part of appellant that the jury be instructed not to consider such remarks. It is shown that the State's attorney held a cartridge in his hand which was taken from the pistol of appellant upon his arrest shortly after this homicide, across the nose of the bullet in which cartridge a cross-mark had been cut. The attorney said, "A bad murder has been committed in our county and that is enough to make any jury bring in a verdict of death," holding up and exhibiting said cartridge. We do not believe the remark of such injurious character as to call for any action on our part, and especially in view of the fact that no request either orally or in writing was presented asking that the jury be instructed not to consider same.

The court below declined to permit appellant's counsel in his argument to narrate certain facts claimed by him to have transpired during the progress of the trial of a case in McLennan County, which

said attorney stated had occurred within his knowledge and experience. We are unable to perceive any error in this. This is going beyond the ordinary rule of illustration or argument. It is permitting the attorney to become a witness and to testify to matters foreign to any issue involved, and about which he does not propose to permit cross-examination, and the truth of which could have no legitimate bearing upon the matters before the court. The court properly declined to permit such argument.

An objection to the court's charge raised for the first time in a motion for a new trial, is not sufficient to present any question relative thereto. Such exception should have been taken, if desired by appellant, before the argument begun in accordance with the direction of our statutes.

Appellant presents three bills of exception to the form of the verdict and attempting to raise the question that said verdict is not responsive to the evidence and should not have been received by the trial court. Said verdict was in the usual form assessing the death penalty, and we find nothing in either of said bills of exception calling for any discussion or consideration at our hands.

Appellant has a bill of exceptions to the refusal of the trial court to sustain his motion to quash the special venire. The recitals of said motion set forth that subsequent to the issuance of the venire writ and prior to the day set for trial there was a tremendous fall of rain amounting to a flood in San Antonio, and that on the day set apart for this trial the number of veniremen in attendance at the court was but a little over one-third the number of names drawn on said list. No effort seems to have been made on behalf of appellant, by attachment or other alias process to have said absent veniremen brought in or their absence accounted for. In this condition of the record appellant is in no condition to complain. It is not shown how the failure to have the full number of veniremen drawn, present and available from which to select the jury to try appellant, injured appellant. No injury is made apparent or even claimed by appellant as resulting from the condition which he asserts prevented the absent veniremen from being present. This disposes of all of the complaints made by appellant in this record.

We see no particular good which can result from a statement of the facts. Appellant was engaged in building a house near the home of deceased, and seems to have concluded that some one was removing material and lumber from his premises. According to the State's case, he went to the home of deceased and stated to the latter's wife that he was going to have everybody in the community arrested and charged with theft of his material but that if she would tell him who was doing it he would make it light on her. She told him that if he wanted to make any such talk as that to make it to her husband, who was then absent. When deceased came home he went over to the

building and was heard by witnesses to say to appellant that he was not going to stand for anyone to use such language as that to his wife. Immediately a shot was heard and deceased started across away from where appellant was, stepping on the floor joist, the flooring plank not yet having been put down. He fell between the joists and then climbed out on to the porch floor, and other shots were fired by appellant, and deceased expired within a few minutes. Appellant came out on the porch of his unfinished house, sat down and twirled a pistol in his hand and remained substantially in this position until the officers came and arrested him. He testified to a hip-pocket movement on the part of deceased which led him to believe his life was in danger and that in consequence he drew his pistol and began firing. The reconciliation of these matters of conflicting testimony was for the jury, and under a charge which seems to fairly submit every theory of the case, they have found appellant guilty and assessed his punishment at death.

Finding no error in the record the judgment of the trial court will be affirmed.

*Affirmed.*

ON REHEARING.

December 20, 1922.

HAWKINS, JUDGE.—Because the motion for rehearing is based largely on the contention that we should not permit a death penalty verdict to stand under the facts of this case we think it proper to set out the evidence more in detail than was done in our original opinion.

Appellant and deceased were both residents of the city of San Antonio. Deceased, with his family, resided in a house which was situated about fifty feet from a lot belonging to appellant, and upon which there was under construction a dwelling house. About a week antecedent to the homicide appellant went to the home of deceased and had a conversation with his wife. The fact that the conversation took place is undisputed. The daughter of deceased testified that appellant said someone had been stealing material from the building he was constructing, and that he intended to have every man, woman and child in the neighborhood arrested, but that if she would tell him who it was he would be more lenient.

Deceased's wife testified that appellant said if she would own up to it he would be lenient with her. She told him that her husband would return at six o'clock in the evening and that appellant could discuss the matter with him if he had anything to say. Appellant's version is that he went to her home and asked deceased's wife if she knew who had destroyed or taken the property; she replied that she did not; that he told her if she knew who it was or anything of the kind, if she would tell what she knew about it, and her children were

parties to it and others were parties to it, that he would be more lenient with them: she replied that she knew nothing about it: that he then said: "I have a good mind to have every man, woman and child in the vicinity summoned before the grand jury aand find out who it was." She said: "You may see my husband, he is home after six o'clock." Appellant, it appears, worked at the building every day during the interval between this conversation and the time of the tragedy, but that not until that day had he stayed until after six o'clock. Returning to his home on the day of the homicide and observing appellant was still at work, deceased went to the house and there the shooting took place. It is described by three eye-witnesses. Mrs. Zelios, who lived nearby, heard the shots, looked out and saw Finucane running. She said:

"I first saw him inside of the house through the window. He ran to the door. I saw him lose one step and go down because the house ain't got no floor. Then he tried again to himself to get to the door, and when he came out, Mr. Stephens came from behind him and shot him. He was ready to jump down to the ground. The back part of his body was towards Mr. Stephens when he shot him there on the front gallery. He just got down and run, tried to get to the house but he no reach to the house. He had his left hand on the upper front of his body, and his right hand down about the stomach. I don't know how many shots were fired; I only heard three. The first two shots were right together. The other was fired later after the deceased reached the door, just as he was ready to jump from the gallery."

The fourteen-year-old daughter of deceased, as well as his wife, testified that he was accustomed to come home at six o'clock and did so every evening after the controversy about the lost property. Describing the tragedy, the daughter said when her father arrived, he was dressed in a shirt and pants, and had his coat over his arm and a paper sack in his hand; these he laid down in his yard and went to appellant's house; that he walked in and said: "Good evening," and then said: "I hear you accuse my wife as being a thief." I will not stand for anybody to talk to my wife like that." Then a shot was fired. Using her language, she said:

"Then he commenced to jump over these sleepers and he got to the door there and fell through the floor, of these sleepers, and I saw Stephens step in front of the window where I had been seeing Daddy, and he shot him twice, then, and then Daddy climbed up from the sleepers and got out of the door, and he says, 'Get a doctor, get a doctor,' and went out from the door, and went out and fell in the street."

She further stated that when she heard the first shot she could not see appellant, but saw her father start to step or jump across the sleepers; that he got to the door and fell through the sleepers. She heard three shots fired. The deceased lived but a few minutes. On cross-examination she said, speaking of her father:

"I knew he was going to ask Mr. Stephens what he meant by saying that to mamma because he said so before. I knew what he was going to say. I stood there talking to the machine man. I was playing with a white rat. My father had his hands at his side when he was first talking, but when he said: 'I won't stand for anybody to talk to my wife like that,' he raised his right hand and extended forwarded with the first two fingers outstretched. He had nothing in it, but he did not keep his hand in that position until the first shot was fired. He took it down when he said that and moved it to his side. Then he turned and stepped from one sleeper to another until he got to the door, and he fell through these sleepers at the door inside of the room. There were two more shots fired when my father was through the floor. He was about six inches from the door, inside the house, when he fell through the floor, lacked six inches being to the door, when he fell between the sleepers."

Mrs. Finucane testified that on the day appellant accosted her about the alleged lost property, she related the matter to her husband upon his return; that she was in her house when the shooting took place, heard it, and ran to the front; that she saw her husband fall in the street and saw the appellant with a pistol in his hand. According to the testimony with reference to the wounds, given by the undertaker and the doctor who examined the deceased, one bullet entered the right side near the breast bone, ranged downward and passed out two inches to the left of the spine, one entered one inch to the right of the spine in the rear and was found about six inches below the navel. One wound was in the left arm and passed forward to the outer side of the elbow, and had its point of exit below the elbow and on top. One bullet went through the body. This entered the breast near the navel and passed out near the spine. There were two holes in the back, one an entrance wound and one an exit wound. The bullet that entered the back did not go through the body. The one that entered the front did penetrate the body. The undertaker produced three bullets at the trial and said that the one which went through the back was not found, but that the others were extracted from the body.

Appellant testified that he saw deceased hand his coat and package to his daughter and walk to appellant's house; that he entered the front gallery and was asked what he wanted, when he replied: "You accused my wife of being a thief." To quote appellant's testimony, he said:

"I say I did not." He says: 'I won't stand it, I won't stand it,' and kept advancing. I says 'Stop;' he didn't stop, but came on and started to reach back on his right side with his right hand and got it back as far as his hip-pocket. Then I jerked my gun from underneath my shirt and fired three times as quick as a double-action Smith-Wesson pistol could fire. At the time I fired these shots I was

in my house near the extreme back end of it, about three feet from the south wall."

It affirmatively appears that deceased was unarmed. Appellant said he saw no weapons; that he supposed he shot the deceased in his back.

"I don't know he started to turn when I shot, and I shot, and as I was pulling the trigger he turned, and I suppose I shot him in the back. I did not shoot until after he reached for his pocket. The first shot was fired while he was facing me; the second shot, partly his side, and the third shot as he turned a little more. I did not move during the shooting. He did not fall through the sleepers at any time. He went out the door. I did not follow him. I did not shoot him after he stepped off the front gallery. I did not shoot him after he fell through the sleepers in front of the door. I shot him all three times before he got out on the porch, or on the two boards which were on the sleepers."

It is strenuously insisted upon the motion for rehearing that the evidence of express malice is lacking, and therefore is not such as justifies the extreme penalty. It has been held that in determining whether a case is bailable, that is, whether it is one in which the death penalty will probably be inflicted, the inquiry may be made whether there is evidence of express malice and a right to bail will turn upon the result of this inquiry. See Ex parte Cole, 89 Texas Crim. Rep., 185, 230 S. W. Rep., 175; Ex parte Townsley, 87 Texas Crim. Rep., 252; Ex parte Young, 87 Texas Crim. Rep., 413; See also Liggon v. State, 82 Texas Crim. Rep., 515. That rule has been adopted largely as a matter of necessity since the abolishment of the degrees in murder in an effort to establish a criterion whereby the judges may act with some uniformity in the matter of bail.

It is argued that when deceased entered the house where appellant was at work on the day of the homicide, he recalling his offensive conduct towards deceased's wife had cause for excitement, and no previous acquaintance or difficulties having been shown between the parties, it is insisted that appellant's conduct is referable rather to the impulsive and inconsiderate action due in part to the excitement aroused by the entry of deceased and his evident resentment at appellant's former conduct than to any previous ill-will of appellant towards deceased, and that the crime should be characterized by implied rather than express malice, and that under such circumstances this court ought not permit a death penalty conviction to stand. Reduced to its final analysis, appellant's proposition is that notwithstanding the Legislature has abolished the degrees of murder based on the distinction between express and implied malice, we should nevertheless apply the old law in determining whether a jury should have assessed the death penalty, and if we conclude that the evidence of express malice is lacking the verdict should be set aside, although the law as it is now written vests the jury with power to assess that penalty. In

our judgment we are without authority to do this. We have a case before us where the jury resolved appellant's plea of self-defense against him; there is no element of manslaughter in it. This leaves a killing upon malice aforethought whether that malice be proved as an existing fact, or implied by the law from the absence of circumstances which would reduce it to manslaughter. The law provides that in such cases the jury may fix punishment at death, or confinement in the penitentiary for life, or for any term of years not less than five. In abolishing the degrees in murder the Legislature must have realized that they were clothing the jury with large discretion in fixing a penalty. In the exercise of that discretion the jury fixed appellant's punishment at death. We express no opinion as to our individual views about it. But if we thought it too severe, we would have no more legal right to set the verdict aside for that reason than we would any other verdict simply because the penalty assessed was more or less than we might think proper.

The motion for rehearing is overruled.

*Overruled.*