# JUNE, 1924.

G. C. GRAY v. THE STATE.

No. 8523.　Delivered June 18, 1924.

Rehearing denied February 25, 1925.

**1.—Murder—Special Venire—Motion to Quash—Properly Refused.**

Where in a trial for murder it is shown that a special venire of two hundred were drawn, only thirty-nine were not served, that few of those summoned failed to attend, that all were excused who were objected to, that attachments for those not present were waived, that a jury was selected from the special venire, without exhausting the peremptory challenges of appellant, and that no objectionable juror was shown to have served, the court properly overruled the appellant's motion to quash the venire.

99 Tex. Crim.—20.

**2.—Same—Indictment—Returned at Special Term—No Error.**

Where an indictment is attacked, on the ground that the grand and petit jurors were not drawn by jury commissioners, the objection raised was properly overruled, where it appeared that the indictment was found at a special term, called in an emergency. It was not illegal to organize the grand jury without jury commissioners.

**3.—Same—Continuance—for Accomplice Witnesses—Properly Refused.**

Where a motion for a continuance is presented, to secure the attendance of two witnesses, jointly indicted for the same offense with appellant, such motion was properly refused. By statute they were precluded from testifying upon behalf of appellant. Art. 791 C. C. P.

**4.—Same—Juror—On Bond of Deceased—Not Disqualified.**

Where a juror was accepted with knowledge by the appellant, that he was a bondsman on an appearance bond of the deceased at the time of the homicide, a challenge after acceptance of said juror for such reason by appellant, was properly refused. This was not a disqualification.

**5.—Same—Accused Handcuffed During Trial—in Discretion of Trial Court.**

Where on the trial an accused, over his protest, was handcuffed in the presence of the jury, no error is shown, if within the discretion of the trial court the safe custody of the prisoner and the peace of the tribunal imperatively demanded that the mancles be retained. Bishop, New Crim. Prac., 2nd Ed., Vol. 2, Sec. 955, and other authorities cited in this opinion.

**6.—Same—Evidence—Acts and Declarations of Co-conspirator—Held Admissible.**

Appellant objects to certain testimony given by the accomplice witness Burl Kemp, after the homicide, and the conspiracy had been consummated. It is clearly established that a co-conspirator, or co-principal who testifies as a witness on behalf of the state, may relate upon the witness stand all that has been done by the accused, in the preparation for the crime, its commission, the disposition of its fruits, the concealment of its perpetrators, suppression of evidence of their guilt and such testimony of a co-conspirator, or co-principal may be corroborated by other witnesses, whose testimony might not be admissible as original testimony against the accused on trial. The same question was before this court in Huey v. State, 81 Tex. Crim. Rep., 544, and other cases cited in this opinion.

**7.—Same—Confessions—Investigation of—Corroborating—Disproving.**

Where a legal confession is made by the accused, all discoveries and material facts disclosed in an investigation of the statements made in such confession, are admissible, as tending to corroborate the inculpatory and disproving the exculpatory declarations contained in such confession.

**8.—Same—Co-conspirators—Acts and Declarations of—Admissible.**

The testimony of the witness Big Gamble showing movements of Paul Keith and Geo. McKinley on the night of the homicide at the East Side School house, was admissible. Paul Keith and Geo. McKinley being admittedly accomplices, and appellant conceding that it was at the East Side School house, that he, in company with Geo. McKinley became associated with the deceased, a short time prior to the homicide.

**9.—Same—Cross-Examination of Appellant—Other Offenses—Admissible.**

It was not error for the District Attorney, on cross-examination of appellant, to ask him if he had not been charged with murder in Titus County

. Texas, in the year 1915. The objection that the time was too remote for impeachment purposes, was not well taken, for the decisions reflect the contrary. See Scoville v. State, 77 S. W. 792, Hull v. State, 50 Tex. Crim. App. 612, Davis v. State, 52 Tex. Crim. Rep., 630, White v. State, 57 Tex. Crim. Rep., 196 and Branch's Ann. Tex., P. C., Sec. 170.

### 10.—Same—Co-Conspirators—Declarations of—Properly Admitted.

The testimony of witness McKinley to the effect that on Saturday night before the homicide, Paul Keith informed him that the appellant would give them $100.00 each to get Ballard out so he could talk to him, was properly admitted. Both McKinley and Keith were indicted for the crime, and the testimony was properly received under the rule which permits the declarations of co-actors in a conspiracy to be received in evidence though not made in the presence of the appellant.

### 11.—Same—Indictment—Several Counts—Election Sufficient.

Where there are several counts in an indictment, submission of only one count in the court's charge is a sufficient election. It is not necessary in the charge to specifically withdraw the other counts.

### 12.—Same—Circumstantial Evidence—Charge on—Properly Refused.

Where the appellant was admittedly present at the time the homicide took place, there being direct evidence that appellant struck the fatal blow, and that appellant entered into a conspiracy to kill the deceased. and was present when the deceased was killed by the means agreed upon, the case could not be said to be one depending upon circumstantial evidence alone.

### 13.—Same—Insanity—Issue not Raised.

The testimony of appellant's wife, as to his sanity was not sufficient to raise that issue. Her testimony specifically asserted that the mental disturbances occurred at times. She gave no testimony that at the time of the homicide such was his condition. Where there are lucid intervals, to excuse the accused on the ground of insanity, the evidence must show that the criminal act was not committed during such period. See Leach v. State, 22 Tex. Crim. App. 280, Roberts v. State, 89 Tex. Crim. Rep., 454.

### 14.—Same—Charge of Court—On Principals—Properly Given.

Where the evidence clearly brings the transaction within the law of principals, as defined by the statutes, such issue should be given in charge to the jury. Arts. 74-78 P. C.

### 15.—Same—Charge of Court—Defensive Theory—Properly Submitted.

Where the court in submitting appellant's defensive theory instructed the jury that if without previous agreement upon the part of appellant to kill Otis Ballard, he was killed by a blow struck by Kemp, while appellant and Ballard were engaged in a conversation, they should acquit the appellant, and if upon this subject they had a reasonable doubt an acquittal should follow, such charge is not so worded as to place the burden of proof as to the defensive theory upon the appellant; nor does it contain any vice or fault calculated to mislead the jury to the prejudice of the appellant.

### 16.—Same—Evidence—Limiting Testimony—Unnecessary When.

Where the testimony of a co-conspirator is admitted, it is not necessary to limit such testimony in the charge of the court. The testimony of co-conspirators with appellant in the commission of the crime, and his declarations, before the homicide and during the conspiracy and in furtherance of its purpose, is admissible as original evidence against the appellant.

**17.—Same—Accomplice Testimony—Corroboration of—Sufficient.**

Where the testimony of appellant, as a witness is corroborative of the testimony of an accomplice in the sense that it tends to connect the appellant with the commission of the offense, is sufficient corroboration of the testimony of such accomplice.

**18.—Same—Sufficiency of Proof.**

The state's evidence fully supports the verdict of the jury in this case. Whether the fatal blow was struck by the appellant, or his confederate is not of any legal significance. According to appellant's own testimony both were present. According to the testimony of his confederate, amply supported by corroborating facts, the death of the deceased was the consummation of an agreement previously formed and deliberately and cruelly consummated by both. Finding no reversible error in the record the cause is affirmed.

ON REHEARING.

**19.—Same—Accused in Irons—Warranted in Instant Case.**

In his motion for rehearing appellant again urges the matter of his having been handcuffed while on trial. This court desires to make it perfectly plain that we regard a trial with the prisoner in irons, as obnoxious to the spirit of our laws, and all ideas of justice, and it is only when the record brings the case clearly within one of the rare exceptions, that we would consent for a conviction to stand. Before a judge should permit a case to proceed under such circumstances, he should be very sure of his ground. We find from this record that the trial court exercised a wise and salutory discretion, which was essential and necessary, in permitting appellant to be handcuffed during his trial.

Appeal from the District Court of Titus County. Tried below before the Hon. R. T. Wilkinson, Judge.

Appeal from a conviction of murder; penalty fixed at death.

The opinion states the case.

*Florence & McCelland* of Mt. Pleasant, *Meyers & Meyers,* of Mt. Pleasant, *Callaway, Short & Callaway* of Dallas, *M. T. Lively* of Dallas, attorneys for appellant.

*T. C. Hutchins,* District Attorney; *Sam Williams,* County Attorney, of Mt. Pleasant; *Tom Garrard,* State's Attorney; *Grover C. Morris,* Assistant State's Attorney, for the State.

MORROW, Presiding Judge.—The offense is murder; punishment fixed at death.

On the night of the 24th of September, 1923, the deceased, Otis Ballard, disappeared. About four days later his body was found in a creek some miles distant. It was badly swollen and decomposed, stripped of its clothing, and had fastened to it with a barbed wire a heavy piece of iron. The evidence reveals without controversy that on Monday night the deceased was killed by a blow or blows upon his head with a piece of iron; that at that time he was in the vicinity

of a certain school-house situated at Mount Pleasant, where he had gone in company with some other boys, among them, Paul Keith and George McKinley. They were joined by the appellant. The others departed, thus leaving the deceased and the appellant together. They walked from the school-house into the woods nearby, where the deceased was killed. While there they were joined by Burl Kemp, a negro. According to the appellant, Kemp, without previous arrangement with appellant and over his protest, struck the Boy Ballard with an iron rod and killed him. Kemp had been working for the appellant for a number of years. He testified that the appellant had told him that he intended to kill Ballard, and that at the appellant's request, he (Kemp) had secured and taken to the home of the appellant a piece of iron suitable for striking the deceased upon the head, and a heavier piece suitable for sinking his body in the water; that, by pre-arrangement McKinley and Keith had induced the deceased to join them at the school-house and had notified the appellant of his presence; that appellant, upon receiving this notice, started to the school-house, instructing Kemp to follow him within a short time; that this was done; and when Kemp reached the school-house, he saw no one, but later saw the appellant and was directed to a trail which led to the body of the deceased which was lying in the weeds and bleeding. The body was carried by Kemp and the appellant for a distance and put into an automobile procured by appellant in the meantime, taken to the creek mentioned, stripped of its clothing, fastened to the iron and sunk in a deep hole in the creek.

Appellant had been charged with burglary. Ballard was a witness against him. Various efforts to induce Ballard to depart from the country had been made by the appellant, and it was his theory and testimony that the meeting at the school-house was sought by Ballard for the purpose of further negotiations touching his leaving the country. The State's theory was that the meeting was sought by the appellant; that McKinley and Keith were accomplices and designedly left the deceased alone with the appellant so that the homicide might take place.

Two hundred veniremen were drawn on the special venire. All but thirty-nine were served. In the motion to quash the return, it was averred that some of the veniremen were not summoned by the sheriff, but by other officers. It appears from the bill as qualified that few of those summoned failed to attend; that the court excused all veniremen to whom the appellant objected because of not having been served by the sheriff; that attachment for those not present was waived; that no talesmen were required but that the jury was selected from the veniremen in attendance without exhausting the peremptory challenges awarded the appellant. No objectionable juror was shown to have served. An irregular summon which results in the attendance of a juror cannot be made a ground for

quashing the venire or the return thereof. Charles v. State, 13 Texas Crim. App. 644; Brown v. State, 87 Texas Crim. Rep. 261. Under the facts given in the bill, the irregularities in the return resulted in no injury to the appellant. Whittington v. State, 86 Texas Crim. Rep. 3, and authorities there cited.

Against the indictment the point is made that the grand and petit juries were not drawn by jury commissioners. The indictment was found at a special term, called in an emergency, and it was not illegal to organize the grand jury without jury commissioners. Ex parte Holland, 238 S. W. Rep. 654; Newton v. State, 247 S. W. Rep. 282; Stephens v. State, 245 S. W. Rep. 687; Bennett v. State, 254 S. W. Rep. 949.

The two witnesses named in the application for a continuance were charged under separate indictments with the same offense. By statute they were precluded from testifying upon behalf of the appellant. Art. 791, C. C. P. One of them, George McKinley, was called as a witness for the state and was cross-examined by the appellant's counsel.

After six of the jurors had been selected, sworn and kept together for a day, appellant sought to challenge one of them for the reason that he was on the appearance bond of the deceased who at the time was under indictment for a criminal offense. On hearing the motion for new trial, it was shown according to the court's qualification that before the juror was accepted, appellant knew that the juror in question was a surety upon Ballard's appearance bond. This was not a disqualification. There was, however, no challenge for cause, and the right to peremptorily challenge the veniremen was waived.

Over his protest, appellant was handcuffed during his trial. It is a rule that one should not be tried in irons. "In extreme and exceptional cases, where the safe custody of the prisoner and the peace of the tribunal imperatively demand, the manacles may be retained." Bishop's New Crim. Proc., 2nd Ed., Vol. 2, Sec. 955. It seems, however, that the departure from the rule upon the ground stated is a matter resting upon the sound judicial discretion of the trial court to be reviewed only in instances where it is abused to the prejudice of the accused. This seems to be the rule applied in Rainey v. State, 20 Texas Crim. App. 455; see page 472. See also Canon v. State, 59 Texas Crim. Rep. 399; Vela v. State, 33 Texas Crim. Rep. 322; Ency. of Law & Proc., Vol. 12, p. 529, note 48; McPherson v. State, 178 Ind. 583; Donehy v. Comm., 170 Ky. 474, 186 S. W. Rep. 161; State v. Miller, 78 Wash. 268, and other supporting the rule cited by Mr. Bishop in the text quoted. The bill is qualified by the transcription of the testimony of the sheriff and some other peace officers heard upon the presentation of the motion for new trial; also by the statement of the judge appended to the bill, which we here copy:

"Examined and approved with this explanation: I also talked with the Sheriff of Titus Co. and Capt. Nichols of the Ranger Service who was assisting the Sheriff during court. They both told me that it was unsafe to take the handcuffs off. I was opposed to trying him with the handcuffs on and so stated to the officers, talking on more occasions than one during the progress of the trial to the Sheriff and Ranger and deputies. Capt. Nichols advanced this reason for keeping the handcuffs on: He said defendant was desperate and in all probability was bent on self-destruction and would very likely try to secure some deputy's pistol and create a stampede in the court room and possibly deliberately do something to force the officers to kill him. I kept the handcuffs on him at the request of the officers. Besides, they were very small silver-plated cuffs, and were not in view when defendant was sitting down. He could easily slip them back under his coat sleeves and could use his hands very well."

Taking note of the evidence before the trial judge, and the information by which he was impelled, we feel that this court would not be warranted in concluding that the record reflicts an abuse of the discretion which the law vested in the trial court.

It is contended that in receiving certain testimony given by the accomplice witness, Burl Kemp, violence was done to the rule of evidence which rejects the acts and declarations of a co-conspirator after the completion of the offense to which the conspiracy related. It is believed that counsel for the appellant in urging this point has not given effect to the manifest distinction which exists in regard to the source from which the evidence comes. To our minds, it seems clear that a co-conspirator or co-principal who testifies as a witness in behalf of the State, may relate upon the witness-stand all that was done by the accused in the preparation for the crime, its commission, the disposition of its fruits, the concealment of its perpetrators, and the suppression of evidence of their guilt; also to any act or declaration of the accused which is relevant to the issue on trial. It occurs to us that, having reference to the particular matter complained of, the rule which appellant seeks to invoke is that which limits the extent to which the acts and declarations of a co-conspirator made or uttered out of court in the absence of the accused, may be proved by other persons who saw or heard the acts or words, when they are sought to be used against one of the co-conspirators or co-principals who is on trial. This class of testimony is hearsay and admissible only when brought within the recognized exception to the rule excluding hearsay. The bill of exceptions under discussion shows that Burl Kemp testified that after the homicide and after he and the appellant had disposed of the body of the deceased, he, Kemp, took his clothes and those of the appellant and some gasoline, and carried them off up the Paris & Mt. Pleasant Railroad and

burned them." It appears from Kemp's testimony that after the deceased was killed and while he was bleeding from his wounds, he was carried by the appellant and Kemp some distance to an automobile, a roadster, in which the witness and the appellant rode with the body a number of miles to a point on the creek, where they removed the body from the car, and the clothing from the body and then put the body in the creek. They returned in the automobile to the home of the appellant and removed their clothes. Appellant directed Kemp to take some gasoline and burn the clothes. Gasoline was given to the witness by the appellant and was taken to the place on the Paris & Mt. Pleasant Railroad which he described and burned the clothes, using the gasoline furnished by the appellant. In our minds, there is no doubt that this evidence was properly received. Upon it, it is conceived that the rule limiting the extent to which the acts and declarations of a co-conspirator after the crime may be proved by other parties has no application. If the appellant, conscious of the fact that the clothes worn by him were stained with the blood of the deceased, and desiring to destroy the evidence of this fact had burned his clothes and those of his confederate, no rule of evidence occurs to us which would throw an obstacle in the way of making proof of this fact by one who had seen the act performed. The facts under consideration reveal an instance in which it was not the appellant in person who burned the clothes, but it was his agent, acting under his directions, who did so. The admissibility of this evidence, as we conceive it, is apart from the rule which the appellant's counsel seems to invoke against it. It was admissible to reveal the conduct of the appellant in his effort to obliterate the evidence of the crime after it was committed. Underhill's Crim. Ev., 3rd Ed., Sec. 502, p. 715; Morris v. State, 30 Texas Crim. Rep. 95; Proctor v. State, 112 S. W. Rep. 770; Coffman v. State, 73 Texas Crim. Rep. 295.

Several witnesses testified that after having a conversation with Burl Kemp, the substance of which is not related by them, they went to a point on the Paris & Mt. Pleasant Railroad and found where clothes had been burned. They also found a half-gallon fruit jar which had contained gasoline; and upon the ground were some charred buttons. The fact that these articles were discovered in the condition mentioned was a circumstance tending to corroborate the accomplice witness upon that part of his testimony in which he declared that upon the appellant's suggestion and with the appellant's gasoline he had destroyed his own clothes and those of the appellant. Since the witnesses did not relate any part of their conversation with Kemp, it would seem that their testimony touching the presence of the articles mentioned at the place where they were found was not rendered inadmissible by the fact that before finding it they had talked to Kemp. The same question was before this court in Huey

v. State, 81 Texas Crim. Rep. 544, and 87 Texas Crim. Rep. 248. On the first appeal of that case, the State witness pointed out the place of the difficulty and also stated the movements of the parties. This was held error. On the second appeal, the evidence went no further than to show that the witness pointed out the place to the officers, and it was held that the testimony of the officers, descriptive of the tracks they found, was properly received. In the cases of Willman v. State, 92 Texas Crim. Rep. 29, and Walker v. State, 252 S. W. Rep. 543, the accomplice Henry testified that the parties accused of the murder told him to hide the spurs of the deceased. He afterwards pointed out to the officers the place at which the spurs were hid. This was held proper upon the citation of authorities, among them being Marta v. State, 81 Texas Crim. Rep. 135. The Howard case, 92 Texas Crim. Rep. 223, to which appellant refers, is brought by the facts on the point under discussion, in line with the Huey case on the first appeal. The accomplice Henry was permitted to make to certain officers, in the absence of the appellant and out of court, a long narration of the facts showing the movements of Howard and his alleged confederates, Walker and Willman. This narration of facts, when given in evidence by the officers, was held by the court to offend against the hearsay rule. In holding that the rules of evidence were transgressed, this court remarked:

"It would have been permissible for the officers to testify that they went to Willman's house, alone or with Henry, and as to what they saw there or elsewhere, but not to testify in effect to what Henry said about the places and things they saw." (Howard v. State, 92 Texas Crim. Rep. 227.)

See also Branch, Ann. Texas P. C., Sec. 695. This principle is illustrated in Pierson's case, 18 Texas Crim. App. 561. Bob Pierson was charged with murder. There was evidence that his brother, Tom Pierson, was a principal in the commission of the offense. Judge Willson wrote the opinion from which we quote:

"It was not error to admit the testimony of the witness Odenheimer as to what he observed at Tom Pierson's house on the morning after the murder; nor to admit the testimony of the witness Tulk as to finding pistols at Tom Pierson's house on said morning. There was positive evidence that Tom Pierson and the defendant, acting together, committed the murder. Whilst the declarations of Tom Pierson, made after the consummation of the murder, and when the defendant was not present, would not be admissible evidence against the defendant, still any fact or circumstance which would tend to prove the guilt of Tom Pierson would also tend to prove the guilt of the defendant, and would be admissible against him, the evidence having directly connected them together in the commission of the offense. Such facts and circumstances would be corroborative of the direct evidence of their guilt. That Tom Pierson was found

in bed at home on the next morning after the murder, while all the other members of the family were up, and that three pistols were found at his house, one of which had the appearance of having been recently discharged, were circumstances which, when considered in connection with the other evidence in the case, were relevant to prove the guilt of this defendant. They were independent, physical facts of an inculpatory nature, and were not acts and declarations of a co-conspirator, transpiring after the consummation of the crime.''

In Branch's Ann. Texas P. C., Sec. 695, it is said:

''Even after the conspiracy has ended, as an exception to the general rule it may be shown that a co-conspirator, or co-defendant, was found in possession of the fruits of the crime or the weapon or instrument with which it was committed.''

In Funk's case, 84 Texas Crim. Rep., 402, which is explained in Howard's case, 92 Texas Crim. Rep., 227. Funk and three other persons were charged with murder. Two of them fled to Mexico. One turned State's evidence. Funk was on trial. Three pistols were produced and identified by the co-principal who testified for the State as having been used in the commission of the crime. The sheriff testified that some months after the homicide, he arrested the two participants who fled to Mexico and brought them to San Antonio, and thereafter went to a certain bridge and got the three pistols. This testimony was held properly admitted. It is true that the sheriff in Funk's case did not testify that before finding the pistols, he talked to the two co-principals. The inference, however, from the circumstances which he did detail, is plain and could not have been overlooked by the jury. The pistols were not found until months after the homicide. They were found by the sheriff when the two confederates who had fled were brought by him to the scene of the homicide.

In the present instance the clothes worn by the two participants, appellant and Kemp, were inseparably connected with the homicide. They were used in disposing of the body. They became stamped with the evidence of the crime. That Kemp destroyed the clothes would obviously be a circumstance connecting him with the offense. Other testimony showed that in the commission of the offense, he and the appellant were co-actors. Therefore, the physical facts such as the possession of the clothes mentioned, or the destruction of them, were circumstances connecting both Kemp and the appellant with the commission of the offense and corroborative of Kemp's testimony. See Pierson v. State, supra.

After his arrest, there was found in the home of Kemp a pair of blue trousers with the laundry mark and the name of the appellant upon them. These were found by a deputy sheriff upon information given him as to their wherabouts by Kemp. The written confession of the appellant which was introduced in evidence recites that after

the body of the deceased had been disposed of, he and Kemp went to the home of the appellant. From the statement we copy:

"I gave Burl some clean clothes and he said he would burn his. I told him where he could find the gasoline. I guess we got back to my house about one o'clock Tuesday morning."

In his testimony upon the trial, appellant declared that Kemp was drunk and said something about a woman; that he hit Ballard on the head with an iron rod and killed him; that Kemp then begged appellant not to reveal the fact and said that if appellant would get his car and help him to cover up the crime until the matter had quieted down, he would tell the truth about it; that Kemp then took the body in his arms, carried or dragged it to a wire fence, remarking at the time that he was getting blood all over himself; that appellant mashed down the wire and got his automobile; that Kemp put the body in it; that at Kemp's direction he drove the car to a point in the creek where Kemp took the body on his shoulders; that after reaching the creek, Kemp took the knife of the appellant and cut the clothes from the body of the deceased. Upon returning and reaching the appellant's garage, he, at the request of Kemp, got a pair of blue serge trousers and a shirt.

It being conceded by the appellant that after the homicide, he let Kemp have the trousers, we fail to comprehend the importance of the complaint made in the bill of the manner in which the trousers were found in the possession of Kemp. So far as it affected the appellant, the material matter was that his trousers had been put into the possession of Kemp. This, according to both the confession and his testimony, was a conceded fact.

In the same class is the testimony to the effect that in going to his home on the night of the homicide, Kemp was seen by a negro woman named Edna Dowdle, when he entered the house about two o'clock in the morning. This was after the homicide. Both Kemp and the woman testified to the fact that he came to his home on the night in question. This was entirely consistent with the testimony of the appellant to the effect that he and Kemp reached the home of the appellant about one o'clock on the night that the deceased had been killed and his body secreted, and that while at the home of the appellant, Kemp was funished with wearing apparel including the trousers found.

It is argued that there was harmful vice in the fact that the deputy sheriff who obtained the trousers from the home of Kemp was permitted to declare that he got them after he had been informed by Kemp that they were there. Assuming that in permitting the officers to relate what Kemp said about the trousers, the court was in error, we are still unable to comprehend its harmful effect, inasmuch as it added nothing to that which came from the appellant touching the time and manner of delivering the trousers to Kemp.

Some months prior to the homicide, appellant was charged by indictment with burglary in Upshur County. The deceased was a witness against him. According to the witness W. P. Ballard, father of the deceased, appellant, after the burglary and before the homicide, told Dr. Ballard that his son, the deceased, and taken part in the commission of the burglary and that if the witness would keep the deceased out of the country until the appellant was acquitted of the charge of burglary, he would see that the deceased came clear and that he would also help him out of his trouble, even if he had to kill the witnesses against him.

From the written confession made by appellant and introduced in evidence, the following synopsis is taken: On Saturday night preceding the homicide on Monday, Paul Keith and George McKinley represented to the appellant that they had talked to Otis Ballard, the deceased, and had been told that if the appellant would give him $100.00 more, he would leave and go to South America and never appear against the appellant in the burglary case. They also said that if appellant would give them $100.00 each, they would go with Ballard; that they realized that they must go to the penitentiary if they did not leave. They proposed to get the deceased where the appellant could talk to him. Upon Monday night, McKinley came to the appellant's home and reported that the deceased was at the East Side School-house. Appellant went to the school-house and from there he and Ballard went into the woods where he was killed by Kemp. Appellant's testimony was in substance in accord with this statement. It occurs to us that in establishing the motive, all declarations and all efforts of the appellant to rid himself of Ballard as a witness and that the inducements offered to the father or to others to obtain that end were available to the State, and that in this class is the testimony of Dr. Ballard at present under consideration. Underhill's Crim. Ev., 3rd Ed., pp. 203-207; Crass v. State, 20 S. W. Rep. 579; Maddox v. State, 254 S. W. Rep. 800; Sapp v. State, 233 S. W. Rep. 459; Branch's Crim. Law, Sec. 1882.

The receipt of evidence of the condition of the body of the deceased and the means of identification, including the statement of the father of the deceased that he was able to identify the body only by the color of the hair; that the body was swollen and badly decomposed, was not improperly received. It was necessary to prove the death in order to prove the corpus delicti, and to corroborate the accomplice Kemp in his description of the homicide, the disposition of the body and the time at which the homicide took place. Underhill on Crim. Ev., 3rd Ed., p. 33; Crossett v. State, 260 S. W. Rep. 186; Todd v. State, 248 S. W. Rep. 695.

The testimony of the witness Nig Gamble showing movements of Paul Keith and George McKinley on the night of the homicide, their presence at the East Side School-house, and their possession of whis-

key, was not improperly received. This testimony tended to support that of the accomplices Kemp and George McKinley. Moreover, the facts were conceded by the appellant to be true in that it was at the East Side School-house that he, in company with George McKinley, became associated with the deceased on the night of the homicide. He also testified that McKinley had whiskey which he had gotten from appellant's home.

The movements of McKinley and Keith showing circumstantially that they left the school-house before the homicide were proper elements of proof.

Appellant, while testifying in his own behalf, was asked by the District Attorney if he had not been charged with murder in Titus County, Texas, in the year 1915. The point made against this question was that it was too remote for impeachment purposes. The court permitted the question, but the answer is not revealed. We have been referred to no authority supporting the proposition that the inquiry related to a transaction so remote as to render it inadmissible for impeachment purposes. The decisions reflect the contrary view. Scoville v. State, 77 S. W. Rep. 792; Hull v. State, 50 Texas Crim. Rep. 612; Davis v. State, 52 Texas Crim. Rep. 630; White v. State, 57 Texas Crim. Rep. 196; Branch's Ann. Texas. P. C., Sec. 170.

The complaint of the receipt of the testimony of the witness McKinley to the effect that on Saturday night before the homicide, Paul Keith informed him that the appellant would give them $100.00 each to get Ballard out so he could talk to him was not improperly received. Appellant testified:

"I had no understanding with George McKinley at all. But Paul Keith said that him and George McKinley wanted to go with Otis, and if I would give them a $100.00 apiece, they would go; and I agreed to give it to them if they would go. I was not getting Otis Ballard out. I was agreeing to give those boys a $100.00 apiece to go with Otis."

Appellant admitted in his testimony that McKinley came to his house and left with some whiskey; that appellant, as soon as he got dressed, followed him to the school-house where he found McKinley, Kieth and the deceased. That he promised to give them $100.00 each was not disputed. He gave his version of the arrangement with Keith about the $100.00. It was permissible for the state to allow McKinley, one of the parties, under the circumstances detailed, to give the testimony complained of. There were circumstances which implicated McKinley and Keith in the conspiracy to kill the deceased. They were in company with the deceased at the school-house where the appellant found him immediately before he was killed. Both McKinley and Keith were indicted for the crime, and the declaration of Keith in conveying to McKinley the promise of the ap-

pellant with reference to the $100.00 was properly received under the rule which permits the declarations of co-actors in a conspiracy to be received in evidence, though not made in the presence of a fellow-conspirator. The cases of Sapp v. State, 223 S. W. Rep. 459; Cohea v. State, 11 Texas Crim. App. 153; Hays v. State, 236 S. W. Rep. 463, may be referred to.

There were several counts in the indictment. The first charged that the homicide was committed by striking Otis Ballard with an iron rod; the second charged that appellant hired Kemp to kill the deceased; the third charged that George McKinley committed the offense and that he was induced to do so by the appellant.

Only the count charging appellant with murder by striking the deceased with an iron bar was submitted to the jury.

The law of principals was charged upon. The jury was also instructed that if the deceased was killed by Burl Kemp without the agreement or cooperation of the appellant there should be an acquittal. The law of accomplice testimony with reference to Kemp and George McKinley was embraced in a charge; also that one accomplice could not corroborate another; also that the other offenses charged could not be elements in any conviction.

But one of the counts in the indictment having been submitted to the jury, there was no error in failing to specifically withdraw the others. It is believed that the complaint of the failure to charge on the law of circumstantial evidence is not tenable. Appellant admittedly was present at the time the homicide took place. According to the testimony of Burl Kemp, a conspiracy to kill the deceased was formed, and appellant struck the fatal blow. There being direct evidence that appellant entered into a conspiracy to kill the deceased and that he was present when the deceased was killed by the means agreed upon, the case could not be said to depend wholly upon circumstantial evidence. See Cabrera v. State, 118 S. W. Rep. 1054; Dobbs v. State, 103 S. W. Rep. 918; Dobbs v. State, 100 S. W. Rep. 945; Bass v. State, 127 S. W. Rep. 1021; Marion v. State, 190 S. W. Rep. 499; Rowan v. State, 260 S. W. Rep. 591.

The extent of the testimony of the appellant's wife touching his mental condition is that he had been in good financial condition until some three years antecedent to the homicide; that in that year he had run over and killed a child; that he was wakeful at nights and brooded over his troubles, particularly that of the burglary, and "he just seemed perfectly unbalanced at time." She heard him threaten to commit suicide many times and say that he would rather be dead than in trouble; that in the previous spring he did lash his throat. It is to be noted that the witness does not express the opinion that appellant was insane to the degree that his mind was in a condition which rendered him incapable of comprehending the difference between right and wrong with reference to the act in question.

Moreover, her testimony specifically asserts that the mental disturbances occurred at times. She gave no testimony that at the time of the homicide such was his condition. Where there are lucid intervals to excuse the accused on the ground of insanity, the evidence must show that the criminal act was not committed during such period. Leache v. State, 22 Texas Crim. Rep. 280; Roberts v. State, 89 Texas Crim. Rep. 454.

We find no specific exception to the charge on principals. We assume that it was the appellant's position that that issue should have been omitted from the charge. With this view we are not in accord. The evidence clearly brought the transaction within the law of principals as defined by the statutes. Arts. 74, 78, P. C., Middleton v. State, 86 Texas Crim. Rep. 307; Sapp v. State, 223 S. W. Rep. 459.

After instructing the jury upon the law of principal offenders in paragraphs 8 and 9 of the charge, the court, in paragraph 10, gave the converse of the State's theory and gave the appellant's defensive theory. The paragraph is so worded as to make the jury understand that if, without previous agreement upon the part of the appellant to kill Otis Ballard, he was killed by a blow struck by Kemp while appellant and Ballard were engaged in conversation, they should acquit the appellant; and if upon this subject they had a reasonable doubt, an acquittal should follow. In our judgment, the charge is not so worded as to place the burden of proof as to the defensive theory upon the appellant; nor does it contain any vice or fault calculated to mislead the jury to the prejudice of the appellant.

We think it was not necessary to limit the testimony of George McKinley to the effect that Paul Keith had told him that the appellant would give him $100.00 to get Ballard out. There being evidence that Keith and McKinley were co-conspirators with the appellant and Kemp in the commission of the crime, the declarations of either of them before the homicide and during the conspiracy, and in futherance of its purpose was admissible as original evidence against the appellant.

The corroboration of the accomplice witness, Burl Kemp, is deemed quite sufficient. Appellant's testimony alone, while in some particulars conflicting with that of Kemp, is nevertheless corroborative in the sense that it tends to connect the appellant with the commission of the offense.

The same is true with reference to the testimony of the accomplice McKinley. Other witnesses testified to numerous details supporting the State's theory that the meeting between the appellant and the deceased shortly before the homicide was prearranged by the appellant and accomplished through the cooperation of McKinley, Keith and Kemp.

The State's evidence supports the conclusion which was manifest-ly reached by the jury that the appellant, after making various efforts to suppress the testimony of the deceased, who was a mere boy, which testimony was against the appellant in a case in which he was charged with felony, he entered into a conspiracy to take the life of the deceased; that the plan was formed with deliberation and carried out with cruelty. Whether the fatal blow was struck by the appellant or his confederate is of no legal significance. Accord-ing to the appellant's own testimony, both were present. According to the testimony of his confederate, amply supported by corroborat-ing facts, the death of the deceased was the consummation of an agreement previously formed.

Under the law of the land, the jury had determined the appel-lant's guilt and measured his punishment. With full sense of the responsibility imposed upon us, we have, with the utmost care of which we are capable, examined the record and the transcript of the proceedings in the trial, and find nothing revealed which would warrant this court in annulling the verdict, which comes with the sanction of the trial judge.

The judgment is affirmed.

### ON MOTION FOR REHEARING.

HAWKINS, Judge.—It is urgently insisted that we were in error in holding that the learned trial judge did not abuse his discretion in permitting the hand-cuffs to remain on appellant during his trial. Appellant cites and relies principally upon State v. Kling, 1 Mo. App. 438, and People v. Harrington, 42 Calif., 165. Kling's case is perhaps the strongest which can be found supporting his contention, but even in that opinion exceptions are recognized to the general rule forbidding prisoners to remain fettered during trial. However, we fail to see so very great difference in shackling the feet and binding the hands, a distinction apparently made in that case, especially as to the effect of either method of restraint upon the minds of the jury. When Kling's case was reversed by the Court of Appeals of Mis-souri, the State appealed to the Supreme Court of that State.· The opinion of the latter court will be found in 64 Mo. Rep. 591. We quote from the syllabus of that opinion:

"As a general rule a prisoner is entitled as a matter of right to be freed from his shackles when brought into the court room for trial, but this rule is not of universal application. The court has the power to take all necessary steps to have the trial a quiet, safe one, even to binding the prisoner with fetters. But there must be some good and sufficient reason for pursuing such extraordinary course, else the judgment of conviction will be reversed."

The Supreme Court upheld the decision of the Court of Appeals upon the finding that the facts in the particular case did not justify the action of the court in trying Kling in shackles, but recognized the doctrine shown in the quotation last above. Harrington's case (supra) does not aid us materially save in the discussion of general principles: No circumstances or facts were claimed to exist making it necessary to leave him in irons during the trial. It appears to have been purely an arbitrary order of the court that he be so tried. After reviewing many of the authorities referred to in Kling's case it is said in Faire v. State, 58 Ala. 74.

"As we understand the foregoing authorities from the learned Blackstone down, there is no absolute, unbending rule that a prisoner on trial for crime shall in no case be fettered. And, inasmuch as there are cases in which it is permissible to try prisoners with shackles on them, we confess ourselves unable to lay down any rule for the guidance of the primary courts, except to leave the question to their sound and enlightened discretion."

The court then declined to further consider the question, holding that it had no right to review a discretionary act of the trial judge. With this last holding we are not in accord. Faire's case was followed in New Mexico v. Kelly, 2 N. M. 292, save as to the latter announcement regarding which it is in consonance with our own view that the question as to whether the trial judge abused his discretion may be reviewed. See also State v. Allen, 45 W. Va. 65; State v. Miller, 78 Wash. 268; McPherson v. State, 178 Ind. 583. Upon the general subject, in addition to the statement from Bishop's New Crim. Proc. found in our original opinion we quote from Wharton's Crim. Proc. Vol. 2, Sec. 476:

"If violent and obstreperous, or if escape be threatened, a defendant may be placed in shackles during trial. Such restraint, however, should not be imposed except in cases of immediate necessity, and where it appears without such necessity by the record there will be a reversal."

From an examination of the text books and the decisions cited in our original opinion and here, as well as many other authorities collated by Wharton and Bishop, and referred to in some of the cases mentioned the rule may be fairly stated that if the record discloses no good reason for having the prisoner manacled during the trial the same will be cause for reversal; on the other hand, if in the sound discretion of the court it appears necessary to retain his shackles to prevent the escape or self destruction of the prisoner, or to prevent him from injuring bystanders or officers of the court, or if necessary to maintain a quiet and peaceable trial, the court may try the prisoner without having the shackles removed; his action being subject to the closest scrutiny and review by the appellate court.

Upon hearing the motion for new trial relative to the complaint at keeping hand-cuffs on appellant the sheriff testified that appellant told him a number of times while he had him in custody that he would kill himself; that when he went to remove appellant from the jail in New Boston to the Paris jail he resisted having the hand-cuffs put on him then, although the removal was at night, and told the officers he "would die and go to hell before he would permit them to put the cuffs on him;" that it was necessary for the officers to choke him down before they could hand-cuff him upon that occasion; that on the road between New Boston and Paris appellant made an assault on the driver of the car; striking him upon the head with the hand-cuffs; that during the trial he threatened to burst his brains out against the walls of his cell, and did butt his head against the wall on one occasion. He had made one attempt to cut his throat with a safety razor blade and during the trial another was found in his pocket. The officers also found and took from him a long finger nail file. He asked the officers on the way from New Boston to kill him, stating that he would probably not get there alive, and that he wanted to die. It is apparent that appellant was regarded as a desperate man by the officers and they feared he would undertake to kill himself or do something to force them to kill him, and that they so informed the learned trial judge. It appears that he was reluctant to permit the trial to go on with the prisoner hand-cuffed, the idea of a trial under such conditions being repugnant to his sense of justice as it is to ours, and one which should not be tolerated save in exceptional cases. After again reviewing the record we feel that we cannot in good conscience say the trial judge was guilty of an abuse of discretion.

We desire to make it perfectly plain that we regard a trial with the prisoner in irons as obnoxious to the spirit of our laws, and all ideas of justice, and it is only when the record brings the case clearly within one of the rare exceptions that we would consent for a conviction to stand. Before a judge should permit a case to proceed under such circumstances he should be very sure of his ground.

The motion for rehearing is overruled.

ON APPLICATION FOR LEAVE TO FILE SECOND MOTION FOR REHEARING.

LATTIMORE, JUDGE.—The application for leave to file second motion for rehearing will be denied. The only matter attempted to be raised, viz: that the trial court erred in not charging on circumstantial evidence, was discussed in the original opinion, and when the matter was up for rehearing it was then thought that said proposition did not present a suggestion of error on the part of the learned trial judge. Appellant testified positively to his presence at the time of the homicide, but averred that the fatal blow was struck by Burl Kemp. All the facts and circumstances in evidence by the other

State witnesses as well as by the accomplice Kemp made plain the proposition that not only was appellant present but participated in the killing and in the removal and secretion of the body, etc.

The leave prayed for will be denied.